837 A.2d 989

**Matthew Thomas FITZGERALD**

**v.**

**STATE of Maryland.**

**No. 2030, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 9, 2003.

602

606

608

610

**612**.

Jason Lyons (Stephen E. Harris, Public Defender, on brief), for appellant.

Annabelle L. Lisc (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before JAMES R. EYLER, ADKINS, CHARLES E. MOYLAN, (retired, specially assigned), JJ.

MOYLAN, J.

In the Circuit Court for Howard County, the appellant, Matthew Thomas Fitzgerald, was found guilty, by Judge Dennis M. Sweeney, sitting without a jury, of the possession of marijuana with the intent to distribute. He was sentenced to two years' imprisonment and a fine of $1,000. All of the prison sentence and all but $250 of the fine were suspended, in favor of two years' probation.

Our concern on this appeal is with the Fourth Amendment correctness of a single pretrial suppression ruling. At issue is the reasonableness of using a drug-sniffing canine to gather probable cause for a search warrant. The ruling to be reviewed is that of Judge Lenore R. Gelfman, who presided over the pretrial hearing. The raw material for our review will be confined to the testimony and other evidence produced during the two days of that hearing.

Two sub-contentions challenge the establishment in the warrant application of probable cause to justify the issuance of the search warrant. They are

A. that the warrant application did not establish probable cause for the search; and

B. that the omission from the warrant application of information on the dog's unreliability fatally compromised, under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the integrity of the warrant application.

Working backward in the investigative chronology, two other sub-contentions concern 1) first the threshold applicability and 2) then the satisfaction of the Fourth Amendment, if

applicable, with respect to the antecedent dog sniffing, the result of which was included in the warrant application. They are

C. that the smelling by a trained dog of odors emanating from a residence, as opposed to lesser protected places, constitutes a search within the contemplation of the Fourth Amendment; and

D. that, if the dog-sniffing were, indeed, a Fourth Amendment search, then no sufficient justification for it had been shown to satisfy the Fourth Amendment.

The remaining sub-contention is a purely contingent one based upon appellate success on one or more of the earlier sub-contentions. It is

E. that, if the result of the dog sniff were excised from the warrant application, the remaining information was not sufficient to establish probable cause.

Even this division by the appellant of the contention into five sub-contentions does not end the proliferating process. The case brings before us so many substantive and procedural nuances that it commits us to a virtual review of the Fourth Amendment, as the outline of what is before us reveals:

I. The Issuance of the Warrant on March 21

A. Probable Cause for the Warrant

1. A Canine "Alert," Without More, Establishes Probable Cause

2. Additional Indications of Probable Criminality

3. The Allocation of the Burden of Proof: The Presumption of a Warrant's Validity

4. A "Substantial Basis" for Issuing the Warrant

5. In Appraising a Search Warrant, The Bar of Judicial Review Is Lowered

B. Does The Requirement of a "Track Record" of Reliability Pertain to the K–9 Corps?

1. The Canine *Curriculum Vitae* and the "Four Corners" Doctrine

2. The Appellant's Attempt to Stray Outside the "Four Corners"

3. The *Franks* Hearing That Never Was

4. A Procedural Masquerade: *Franks v. Delaware* Disguised as *Frye–Reed*

Interlude:

What We Have Held And What We Have Not Held

II. The Warrantless Activity of March 19

A. The Appellant's Challenge to the Antecedent Police Action of March 19

1. Readjusting the Fourth Amendment Standard of Review

a. In a Single Suppression Hearing, A Judge May Play Different Roles

b. For Warrantless Searches, a Counter Presumption

c. The *Sheppard–Leon* "Good Faith" Exemption Is Limited to the Execution of a Warrant

2. The Threshold Requirement of Fourth Amendment Applicability

a. The Coverage of the Place Searched

b. The Coverage of the Searcher (State Action)

c. The Coverage of the Defendant (Standing)

d. The Coverage of the Police Conduct (Was It a Search? Was It a Seizure?)

e. The Impact of *Katz*

f. The Standard of Review for Assessing Applicability

g. The Burden of Proof as to Applicability

3. The Launching Pad From Which the Dog Sniffing Was Conducted: The Non–Coverage of the Place

4. Is a Dog Sniff a "Search," Generally?

5. Does the Presence of a Home Transform a "Non–Search" Into a "Search"?

6. The Use of a Dog's Nose Is Not A New or Startling Investigative Modality

B. The Arguable Justification for the Purported "Search" of March 19 Is Moot

III. An Appraisal of the Discounted Warrant Application Is Moot

### The Search of 3131 Normandy Woods Drive

On March 21, 2002, a search and seizure warrant for 3131 Normandy Woods Drive, Apartment A, in Ellicott City was issued by District Court Judge JoAnn Ellinghaus–Jones. The affiant on the warrant was Detective Leeza Grim of the Criminal Investigation Bureau, Vice and Narcotics Division, of the Howard County Police Department. The warrant was executed on April 2. Recovered in the search were substantial amounts of marijuana and other evidence of marijuana use and marijuana distribution. The appellant moved, pretrial, to suppress the evidence. Judge Gelfman denied the motion.

### Part I

### The Issuance of the Warrant on March 21

#### A. Probable Cause for the Warrant

Detective Grim was initially put on the trail of the appellant and his live-in girlfriend, Allison Mancini, when she received information from an "anonymous source." The affidavit in support of the warrant application recited:

In February, 2002, DFC. Grim received information from an anonymous source that a white male and white female lived together in Normandy Woods Apartments and sold marijuana on a regular basis. The marijuana in question

was a high quality grade called "Kind Bud". The source advised that the names of the individuals were Matt Fitzgerald and Allison Mancini and that they had a white pickup truck.

Subsequent investigation by Detective Grim—1) of the automobile registration of a white pick-up truck parked close to 3131 Normandy Woods Drive, 2) of Baltimore Gas and Electric Co. service records for Apartment A at that address, and 3) of the Howard County Police Records Management System—confirmed that the appellant and Mancini lived in Apartment A of 3131 Normandy Woods Drive.

The appellant, moreover, had a juvenile arrest history that included:

February 3, 1998-Distribution of Marijuana Near a School

July 6, 1998-First Degree Burglary

August 6, 1998-First Degree Burglary

August 12, 1998-First Degree Burglary

On March 20, Detective Grim received an additional report from the anonymous source:

On March 20, 2002, your affiant received additional information from the anonymous source that the subjects continue to sell the "Kind Bud" marijuana.

To confirm her suspicions, Detective Grim enlisted the aid of Officer Larry Brian of the Howard County Police Department's canine unit and of the trained and certified canine, Alex. The affidavit recited their investigation.

On March 19, 2002, your affiant met with K–9 Officer Brian and requested that he utilize his canine to scan the stairwells and exterior apartment doors at 3131 Normandy Woods Drive. Pfc. Brian conducted a scan of apartment doors A, B, C & D. *His canine alerted to the presence of narcotics only at apartment "A".* Pfc. Brian repeated the process with identical results. *Pfc. Brian's canine is a*

*certified drug detecting dog and scans have resulted in numerous arrests.*

(Emphasis supplied).

### 1. A Canine "Alert," Without More, Establishes Probable Cause

As we affirm the adequacy of the warrant application, we hold that Alex's "alert" to Apartment A was *ipso facto* enough to establish probable cause. Both the Court of Appeals and this Court have regularly affirmed the dispositive sufficiency of a canine "alert." In *Gadson v. State*, 341 Md. 1, 8, 668 A.2d 22 (1995), Judge Chasanow stated for the Court of Appeals:

> Nor does Gadson dispute that *once Sandy the dog alerted Trooper Prince to the presence of illegal drugs in the vehicle, sufficient probable cause existed to support a warrantless search of the truck.* See *United States v. Dovali–Avila*, 895 F.2d 206, 207 (5th Cir.1990) (a "dog alert" is sufficient to create probable cause to conduct a warrantless vehicle search).

(Emphasis supplied). In *Gadson v. State*, 102 Md.App. 554, 556–57, 650 A.2d 1354 (1994), *rev'd on other grounds*, 341 Md. 1, 668 A.2d 22 (1995), this Court characterized the canine "alert" on which the Court of Appeals, as quoted above, placed its imprimatur.

The probable cause to believe that the truck contained contraband narcotics was supplied by "Sandy," a member of the Maryland State Police K–9 corps, who had been licensed as a certified drug detection dog and who worked regularly with Trooper Prince. As Sandy stood outside the appellant's truck, with its doors closed, he "alerted" to the presence of narcotics. *That the "alert" to the presence of narcotics by a trained and certified drug-sniffing canine is ample to establish probable cause is well established law.*

Looking forward from the moment when Sandy, by "alerting," communicated his belief to Trooper Prince that narcotics were in the truck, the Fourth Amendment was not

offended by the ensuing warrantless *Carroll* Doctrine search of the truck for those narcotics.

(Emphasis supplied).

In *Wilkes v. State,* 364 Md. 554, 586, 774 A.2d 420 (2001), Judge Cathell stated authoritatively:

The troopers were able to conduct a lawful search of petitioner's vehicle because after the K–9 scan alerted to the presence of narcotics they had probable cause to do so. We have noted that *once a drug dog has alerted a trooper "to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]."*

(Emphasis supplied).

■ The same degree of certainty that will support the warrantless *Carroll* Doctrine search of an automobile will, *ipso facto,* support the warrantless arrest of a suspect. In passing, *Wilkes v. State,* 364 Md. at 587 n. 24, 774 A.2d 420, alluded to this arrest-search equivalency:

Moreover, some jurisdictions have held that *once a drug dog has alerted the trooper to the presence of illegal drugs in a vehicle, sufficient probable cause existed to support a warrantless arrest. See United States v. Klinginsmith,* 25 F.3d 1507, 1510 (10th Cir.) ("[W]hen the dog 'alerted,' there was probable cause to arrest [defendants] . . . ."), *cert. denied,* 513 U.S. 1059, 115 S.Ct. 669, 130 L.Ed.2d 602 (1994); *United States v. Williams,* 726 F.2d 661, 663 (10th Cir.1984) ("[A] drug sniffing dog's detection of contraband in luggage 'itself establish[es] probable cause, enough for the arrest, more than enough for the stop.'" (alteration in original) quoting *United States v. Waltzer,* 682 F.2d 370, 372 (2d Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983)).

(Emphasis supplied). The arrest-search equivalency was also noted by *State v. Wallace,* 372 Md. 137, 147–49, 812 A.2d 291 (2002).

This Court reached the same conclusion in *Grant v. State,* 55 Md.App. 1, 14–15, 461 A.2d 524 (1983), *cert. dismissed,* 299 Md. 309, 473 A.2d 455 (1984).

> *They carried the seized suitcase into the airport and ex-posed it,* scrupulously unopened, *to the trained nose of a cocaine-sniffing police dog.* The dog promptly and emphatically "alerted." Adding *this additional probability* to the abundant probable cause already possessed, the police applied for and obtained a constitutionally unassailable search and seizure warrant.

(Emphasis supplied).

In *Snow v. State,* 84 Md.App. 243, 248, 578 A.2d 816 (1990), Judge Rosalyn Bell wrote:

> We agree with the State that, if Paros properly and constitutionally conducted the scan or sniff of the perimeter of the car using his trained dog, *the dog's responses could be held to provide probable cause* to search the interior of the car.

(Emphasis supplied). See also *Timmons v. State,* 114 Md. App. 410, 417, 690 A.2d 530 (1997); *Carter v. State,* 143 Md.App. 670, 674, 795 A.2d 790 (2002) ("The dog 'alert' supplied the probable cause for a warrantless search of the van.").

In this case, the affidavit attested that "Pfc. Brian's canine is a certified drug detecting dog and scans have resulted in numerous arrests." In *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001), this Court unequivocally held:

> In this case there was no disputing the olfactory expertise of the trained and certified cocaine-sniffing canine. *When a qualified dog signals to its handler that narcotics are in a vehicle, moreover, that is ipso facto probable cause to justify a warrantless Carroll Doctrine search of the vehicle.*

(Emphasis supplied). See also *In Re Montrail M.,* 87 Md. App. 420, 437, 589 A.2d 1318 (1991) ("the dog's reaction properly served as probable cause to search the vehicle."); *State v. Wallace,* 372 Md. at 145, 812 A.2d 291 ("Nor is there any argument that ... the canine sniff of the Buick ...

provided the police officers with probable cause to search the car.").

The federal case law is in line with Maryland's position. See, e.g., *United States v. Williams*, 69 F.3d 27, 28 (5th Cir.1995) ("The fact that the dog alerted provided probable cause to search."); *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir.1993); *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994) ("[A]n alert by a properly trained and reliable dog establishes probable cause."); *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir.1993) ("We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures."); *United States v. Florez*, 871 F.Supp. 1411, 1417 (D.N.M.1994) ("The Tenth Circuit has consistently held that a positive dog alert by a trained narcotics dog, standing alone, is generally sufficient to support a finding of probable cause."); *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir.1997); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir.1989); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir.1984); *United States v. Wood*, 915 F.Supp. 1126, 1142 (D.Kan.1996) ("The alert of a trained and certified narcotics detection canine, by itself, provides probable cause to believe the car contains narcotics.").

### 2. Additional Indications of Probable Criminality

██ Although it is superfluous in this case, there was significant other evidence to support the issuance of the warrant. The information supplied by the anonymous source, assuming it to have been reliable, was substantively damning to the appellant's cause. The source stated that the appellant and his companion "sold marijuana on a regular basis" and that the "marijuana in question was a high quality grade called Kind Bud." On the day after the canine sniffing at the apartment, the anonymous source called back and indicated that "the subjects continue to sell Kind Bud marijuana."

██ The nature of the information received gave rise to an inference that the source could well have been a concerned neighbor. In *Carter v. State*, 143 Md.App. 670, 678, 795 A.2d 790 (2002), we addressed a similar permitted inference.

At about 7:40 p.m. the Howard County Police Department received a telephone call. *The caller*, to be sure, *was anonymous. The circumstances were such*, however, *as to give rise to a reasonable inference that the caller was a concerned neighbor* and, therefore, a "citizen informer" rather than the more suspect confidential informant "from the criminal milieu." For the distinction, see *Dawson v. State,* 14 Md.App. 18, 33–34, 284 A.2d 861 (1971); *Hignut v. State,* 17 Md.App. 399, 410 n. 2, 303 A.2d 173 (1973).

(Emphasis supplied).

In *Carter v. State,* we analyzed at length, 143 Md.App. at 678, 795 A.2d 790, the distinction between citizen-informers and "stool pigeons" from the criminal milieu.

Throughout the 1960's and 1970's, an extensive body of law developed as to how courts should assess information received by the police from informants (including telephone callers). The earlier cases involved instances in which the informant was the classic police "snitch" or "stool pigeon," someone "from the criminal milieu," exchanging underworld information for cash payment or for other under-the-table police favors. The assessment of information from such sources was accordingly circumscribed with scepticism. The suspect's credibility needed bolstering in order to be given any weight.

As the analysis of information from third-party sources evolved, however, it soon came to be recognized that *there was also a broad category of third-party sources, such as concerned citizens or fellow law enforcement officers, whose veracity was not inherently suspect and as to whom the skepticism directed at police stool pigeons was not appropriate.*

(Emphasis supplied).

In this case, moreover, there was extensive independent verification of the anonymous source's report. Information as to the identities of the male and female occupying Apartment A turned out to be accurate, as did the information as to their ownership of the white pick-up truck. Of more direct perti-

nence to criminality, the police records check on the appellant fully corroborated the source's story. The source reported that the appellant was selling marijuana; his juvenile record showed that in 1998 he had been arrested for the distribution of marijuana near a school.

■ The appellant's juvenile record, we should add, serves a double function in a case such as this. It is direct evidence bearing on the probable cause itself. Additionally, it serves as independent police verification of the reliability of the information coming from the anonymous source.

■ Also serving that double function was the March 19 canine "alert" to Apartment A. In addition to establishing probable cause for the search in and of itself, it verified in the strongest possible way the accuracy of the source's report that marijuana was being sold from that address.

In her Memorandum Opinion and Order, Judge Gelfman took note of this extensive verification of the source's reliability.

> While the source's reliability in the case *sub judice* could not be attested to due to the anonymity of the source, the source was able to give detailed information, including Defendants' names, the type of car they drove and the type of marijuana they sold. Additionally, *Detective Grim corroborated the information with computer searches, personal observations of the name on the mailbox and the location of the truck, and ultimately with the use of a canine sniff.*

(Emphasis supplied).

### 3. The Allocation of the Burden of Proof: The Presumption of a Warrant's Validity

■ At the conclusion of the suppression hearing, Judge Gelfman ruled, *inter alia,* that the warrant application established a "substantial basis" for Judge Ellinghaus–Jones to have issued the warrant.

Based on the foregoing discussion, this Court finds that *Defendants have failed to meet their burden to prove that*

*the magistrate lacked a "substantial basis"* for concluding that there was probable cause for issuing a search and seizure warrant.

(Emphasis supplied). In passing, we commend Judge Gelfman's meticulously proper allocation of the burden of proof when a defendant challenges the adequacy of a search warrant. She pointed out not that the State had met its burden, but that the defendant had failed to meet his burden.

■ One of the ways in which the Supreme Court has provided an incentive for police officers to resort to judicially issued search warrants has been to create the presumption in their favor that searches conducted with warrants are, nothing else being shown, valid, whereas the opposite presumption prevails with respect to warrantless searches.

■ Once it is established, as it was in this case, that the police obtained a search warrant, there is a presumption that the warrant was valid. The burden of proof is allocated to the defendant to rebut that presumption by proving otherwise. Once a warrant is shown to exist, the State wins the nothing-to-nothing tie (or a tie at any other level). The allocation of the burden of proof is the law's tiebreaker.

In *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court referred to this presumptive validity:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.

The Court of Appeals took note of this presumption of regularity in *Malcolm v. State,* 314 Md. 221, 229–30, 550 A.2d 670 (1988):

> As the key protection from unreasonable government searches, warrants continue to be favored at law.... *[T]he defendant must overcome the presumption of regularity attending a search warrant. See Massachusetts v. Upton*

(1984). Thus, the overall incentive to obtain a search warrant remains strong.

(Emphasis supplied).

This Court, in *Herbert v. State*, 136 Md.App. 458, 492, 766 A.2d 190 (2001), discussed in detail the allocation of the burden of proof to a defendant challenging a warrant.

Once again, the Supreme Court has provided *an incentive for searching with a warrant and a disincentive for searching warrantlessly. What are affected by this incentive/disincentive combination are the burdens of proof at a suppression hearing.* When the State has procured evidence of guilt by the favored and preferred modality of a warranted search, it is rewarded by a presumption of validity in favor of its warrant application. *Let the fact be once established or otherwise accepted that the search in issue was pursuant to a judicially issued warrant and the State is then entitled to the presumption. Because it is the State that enjoys the presumption, the burden is allocated to the defendant to rebut it, if he can.*

(Emphasis supplied). See also *In re Special Investigation No. 228*, 54 Md.App. 149, 195–96, 458 A.2d 820 (1983) ("The burden was not upon the State to prove that there was probable cause; it was upon the petitioners to prove that there was not."); *State v. Riley*, 147 Md.App. 113, 117–20, 807 A.2d 797 (2002).

### 4. A "Substantial Basis" For Issuing the Warrant

 Judge Gelfman's ruling that the warrant had a "substantial basis" for its issuance continued:

The evidence presented to the magistrate must be viewed as building blocks to probable cause. Detective Grim received an anonymous tip. From this tip, the Detective performed computer searches to verify whatever information possible. Initially, Detective Grim obtained Defendants' names, but did not match them to the address given by the source. So, she investigated further and found that a white pick-up truck was located in front of the implicated

apartment building, and this white pick-up was registered to someone with the same last name as the female identified by the source. Again, the Detective does not merely rely on this information, but rather checks the mailboxes on this apartment building and finds the last name of the male identified by the anonymous source on the mailbox for apartment A. Detective Grim then does a BG & E inquiry, verifying that Defendant Fitzgerald began service at apartment A on 9–7–01. Additionally, Detective Grim obtains a juvenile record for Defendant Fitzgerald to add to the evidence she had compiled to that point. Finally, rather than relying solely on information received by the anonymous source and her preliminary verification of the facts, Detective Grim obtains a canine scan of the apartments in the target building. After *this canine scan results in a positive alert at the door of the apartment being rented by Defendant Fitzgerald,* and after receiving another tip from the anonymous source that marijuana continues to be sold out of this residence, Detective Grim completes her application for a search and seizure warrant, providing the magistrate with the above timeline of events, as well as her own credentials.

Detective Grim followed procedure correctly by verifying the information received by an anonymous source through computer research, personal observation of the location of the truck and the label on the mailbox, and the use of a canine scan. And, *the magistrate appropriately found that the information provided within the four corners of the application and supported by affidavit substantiated probable cause to issue a search and seizure warrant.*

(Emphasis supplied).

 Once again, Judge Gelfman commendably recognized the constraints on her reviewing role. She did not presume to find probable cause. That was not her job. What she found was that Judge Ellinghaus–Jones had had a "substantial basis" for finding probable cause. That was her job.

### 5. In Appraising a Search Warrant, The Bar of Judicial Review Is Lowered

Even if we were making an independent *de novo* determination as to the existence of probable cause to support the warrant, our result in this case would be the same. In appraising the adequacy of the warrant application, however, neither a reviewing trial court nor a reviewing appellate court is permitted to make its own independent determination as to probable cause. The habit of making independent *de novo* determinations of ultimate constitutional "facts" is recently becoming so ingrained, however, that bench and bar need to be reminded periodically that *de novo* determination is not the appropriate standard of review for search warrants. This, rather, is one of those situations in which we do not make a *de novo* determination of probable cause. Judge Thieme discussed the more deferential standard in *West v. State*, 137 Md.App. 314, 322, 768 A.2d 150 (2001):

> *Reviewing courts* (at the suppression hearing level or at the appellate level) *do not undertake de novo review of the magistrate's probable cause determination* but, rather, pay "great deference" to that determination. *Id.* at 236, 768 A.2d 150; *Ramia v. State*, 57 Md.App. 654, 655, 471 A.2d 1064 (1984). Reflecting a preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that, *so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.*

(Emphasis supplied).

In *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court was emphatic about how a reviewing court should appraise a warrant:

> "Similarly, we have repeatedly said that *after-the-fact scrutiny by courts* of the sufficiency of an affidavit *should not take the form of de novo review.* A magistrate's 'deter-

mination of probable cause should be paid great deference by reviewing courts.' "

(Emphasis supplied).

In *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court reaffirmed the position it had taken in *Illinois v. Gates* with respect to the proper standard of judicial review:

We also emphasized that *the task of a reviewing court is not to conduct a de novo determination of probable cause,* but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant.

(Emphasis supplied). The United States Supreme Court in that case reversed the Supreme Judicial Court of Massachusetts for having presumed to conduct a *de novo* probable cause determination.

The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, *the court conducted a de novo probable-cause determination. We rejected just such after-the-fact de novo scrutiny in Gates.*

466 U.S. at 732–33, 104 S.Ct. 2085 (emphasis supplied).

This Court placed its own seal of approval on the highly deferential standard of review in *Ramia v. State,* 57 Md.App. 654, 660, 471 A.2d 1064 (1984):

*Illinois v. Gates* leaves no room for doubt that *reviewing courts,* at the appellate level or at the suppression hearing level, *have no business second-guessing the probable cause determinations of warrant-issuing magistrates by way of de novo determinations of their own.*

(Emphasis supplied).

In *Potts v. State,* 300 Md. 567, 572, 479 A.2d 1335 (1984), Chief Judge Robert Murphy stated distinctly for the Court of Appeals:

After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review.

See also *McDonald v. State,* 347 Md. 452, 467–68, 701 A.2d 675 (1997); *Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488 (1989); *State v. Amerman,* 84 Md.App. 461, 469, 581 A.2d 19 (1990) ("[R]eviewing courts shall not presume to assess probable cause *de novo* but shall instead extend 'great deference' to the prior determination of the magistrate on that issue.").

Judge Gelfman properly ruled that the application established a "substantial basis" for Judge Ellinghaus–Jones to have issued the search warrant. She properly did not offer her own opinion on the subject of probable cause.

### B. Does The Requirement of a "Track Record" Of Reliability Pertain to the K–9 Corps?

The appellant mounts yet a second attack on the issuance of the search warrant. In days of yore, when the two-pronged test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), was the height of Fourth Amendment fashion, analysis abounded about informants' "track records" of successes and failures. The appellant's next contention raises the question of whether that once familiar inquiry has passed forever from our ken or has simply been transferred to the K–9 Corps.

The appellant argues that the "omission from the affidavit of information demonstrating [Alex's] unreliability renders the search warrant invalid." He challenges Alex's competence. We shall look at that challenge in two contexts. We shall first examine it within the traditional context for assessing the adequacy of a warrant (including its application), to wit, within the "four corners" of the warrant and warrant application. We shall secondly examine whether 1) a required showing was made for going outside the "four corners"; and 2) if such a showing was successfully made, what significance that extrinsic evidence may have.

## 1. The Canine Curriculum Vitae And the "Four Corners" Doctrine

The appellant contends that the assertions in the warrant application about Alex's "alert" to Apartment A are facially insufficient to establish probable cause because, "[w]ithout further information demonstrating the dog's reliability, the alert does not establish probable cause." The heart of the appellant's contention is:

> Since *the affidavit here contains no information concerning Alex's reliability beyond the mere assertion that he is "a certified drug detecting dog,"* Alex's alert to the presence of drugs does not establish probable cause for issuance of the warrant.

(Emphasis supplied).

In *Emory v. State,* 101 Md.App. 585, 647 A.2d 1243 (1994), as in this case, the appellants were challenging the validity of a search warrant. In that case, as in this, part of the probable cause for the warrant was that a "dog gave a positive alert for drugs." 101 Md.App. at 634, 647 A.2d 1243. The appellants there claimed, as does the appellant here, that the "olfactory reactions made by the dog should not have been considered by the warrant-issuing magistrate in assessing probable cause" because "an adequate predicate of reliability was not established" by the warrant application. 101 Md.App. at 634, 647 A.2d 1243. As authority for their argument, the appellants relied on *Terrell v. State,* 3 Md.App. 340, 239 A.2d 128 (1968), and *Roberts v. State,* 298 Md. 261, 469 A.2d 442 (1983).

In rejecting the contention, this Court pointed out the chasm of difference between the admissibility of challenged evidence at a trial and the consideration of such information in an *ex parte* warrant application. There are a number of challenges that a defendant might properly mount against the admissibility of a piece of evidence or the results of an investigative technique at the trial on the merits that are completely inappropriate by way of challenging their inclusion in an application for a search warrant. The forums are completely different and the respective rules of admissibility

are completely different. In distinguishing *Terrell v. State,*
we pointed out, 101 Md.App. at 634, 647 A.2d 1243:

> *Terrell* is not remotely apposite. *Terrell* involved the ad-
> missibility of dog-sniffing evidence not in an *ex parte* war-
> rant application, but at the ultimate trial on the merits. . . .
>
> . . . .
>
> . . . *The appellants are uncritically attempting to incor-*
> *porate the prerequisites for trial admissibility into the far*
> *less formal setting of a warrant application.* Actually, they
> are simply asserting that the *Terrell* prerequisites must be
> satisfied, without pointing out the significant difference
> between the two forums. We hold that *the requirements*
> *for trial admissibility are not prerequisites to the use of the*
> *information in assessing probable cause.*

(Emphasis supplied).

We similarly distinguished *Roberts v. State:*

> A very similar situation was dealt with by the Court of
> Appeals in *Roberts v. State.* In that case, a rapist was
> identified at trial because of the ability of a trained tracking
> dog, appropriately named "Sniffer," to follow a trail after
> having smelled a ski cap worn by the rapist and ultimately
> to pick out the defendant from what was referred to as a
> "dog lineup." The Court of Appeals held the evidence to be
> admissible, relying in part on testimony detailing the train-
> ing and the handling of Sniffer. *In that case,* as in *Terrell,*
> *the question was the admissibility of the evidence at the*
> *ultimate trial on the merits.*

101 Md.App. at 634–35, 647 A.2d 1243 (emphasis supplied).

To the extent to which the appellant is now claiming that
the warrant application was inadequate on its face because of
either 1) an insufficient showing of the dog's reliability or 2)
the failure to include the dog's "track record" in the applica-
tion, our holding in *Emory v. State,* 101 Md.App. at 635, 647
A.2d 1243, is dispositive.

> *It does not follow in any way from Terrell or Roberts that*
> *there are any such requirements or qualifications that*
> *must be satisfied before the results from a canine sniff can*

*be considered in a warrant application* in the assessment of probable cause. By analogy, a confession must be shown to be voluntary before it may be introduced in court. A warrant application may make reference to a confession without any such qualification. A lineup identification must be shown to be reliable before it can be introduced in court. There is no such threshold requirement for it to be considered in a warrant application. Prior criminal records that may never be introduced in court are standard fare in a warrant application. *The warrant-issuing process is ex parte and is far less formal than a courtroom proceeding.* (Emphasis supplied).

What did pass muster in *Emory v. State* was that the "marijuana-sniffing dog ... was certified and was regularly described in the warrant as certified." *Id.* The sufficient characterization in *Gadson v. State*, 102 Md.App. at 557, 650 A.2d 1354, had been to "a trained and certified drug-sniffing canine." The adequate reference in *State v. Funkhouser*, 140 Md.App. at 711, 782 A.2d 387, was to "the trained and certified cocaine-sniffing canine."

In *United States v. Meyer*, 536 F.2d 963 (1st Cir.1976), a search warrant was attacked on the ground that the affidavit in support of the warrant simply stated that the dog was "trained" to detect drugs and that such was insufficient to establish its reliability. In rejecting the contention, the First Circuit said:

> Furthermore, the word "trained," when considered in the context of the affidavit, has a common and well understood meaning.... Assuming, therefore, that the magistrate was a qualified official possessing ordinary and reasonable intelligence and prudence it does not in our view defy logic to conclude that the magistrate understood that the "trained dog" was endowed, by reason of experience and training, with the ability to sniff out cocaine.

536 F.2d at 966.

A similar attack on the adequacy of a warrant application was made in *United States v. Venema*, 563 F.2d 1003 (10th

Cir.1977). The Tenth Circuit held that it is not necessary to go beyond characterizing the dog as "trained and certified" and that no further underlying facts need to be shown. It held:

> In this regard the defendant takes particular aim at the statement in the affidavit that Chane was a "trained, certified marijuana sniffing dog." Such, according to counsel, is a conclusory statement and does not sufficiently set forth the underlying facts so as to allow the issuing judge to exercise his independent judgment on the matter. *We do not agree that Chane's educational background and general qualifications had to be described with the degree of specificity argued for by counsel.*
>
> . . . . .
>
> We agree with the reasoning of *Meyer,* and *the statement in the present affidavit that Chane was trained and certified as a marijuana-sniffing dog is sufficient.*

563 F.2d at 1007 (emphasis supplied).

*United States v. Sentovich,* 677 F.2d 834 (11th Cir.1982), dealt with a similar attack on the results of a dog sniff offered in a warrant application. It observed:

> His argument is that a mere statement that the dog had been trained in drug detection was not enough without an accompanying statement that the dog had proved reliable in the past and that an experienced handler was with the dog. . . . We believe, in any event, that his argument is without merit. The case on which Sentovich relies, *United States v. Klein,* 626 F.2d 22, 27 (7th Cir.1980), does state that *statements that a dog had had training and had proved reliable in the past were sufficient indicia of the dog's reliability.*

677 F.2d at 838 n. 8 (emphasis supplied). See also *United States v. Maejia,* 928 F.2d 810 (8th Cir.1991); *United States v. Massac,* 867 F.2d 174 (3d Cir.1989); and *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987).

In *United States v. Daniel,* 982 F.2d 146, 151 n. 7 (1993), the United States Court of Appeals for the Fifth Circuit rejected a

defendant's argument that the affidavit itself must show how reliable a drug-detecting dog has been in the past in order to establish probable cause. See also *United States v. Williams,* 69 F.3d 27, 28 (5th Cir.1995). In *United States v. Berry,* 90 F.3d 148, 153 (1996), the Sixth Circuit held that a search warrant application need not describe the particulars of a dog's training and that a reference to the dog as a "drug sniffing or drug detecting dog" is sufficient to support probable cause. In *United States v. Klein,* 626 F.2d 22, 27 (1980), the Seventh Circuit held that a statement that the dog had graduated from training class and had proven reliable in detecting drugs on prior occasions was sufficient to support probable cause.

In *United States v. Kennedy,* 131 F.3d 1371, 1376–77 (1997), the Tenth Circuit articulately stated the general rule:

> As a general rule, *a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics* .... *We decline to encumber the affidavit process by requiring affiants to include a complete history of a drug dog's reliability* beyond the statement that the dog has been trained and certified to detect drugs.

(Emphasis supplied).

For the proposition that the failure to have included in the warrant application information bearing on Alex's "track record" rendered the warrant invalid, the appellant cites the three federal cases of *United States v. Ludwig,* 10 F.3d 1523 (10th Cir.1993); *United States v. Diaz,* 25 F.3d 392 (6th Cir.1994); and *United States v. Wood,* 915 F.Supp. 1126 (D.Kan.1996). Significantly, not one of those cases involved a warranted search or the review of a warrant application. Each of those cases involved warrantless canine scans of vehicles and they have no bearing, therefore, on the issue before us of whether a warrant application established a "substantial basis" for issuing the warrant.

Quite aside from the critical difference in procedural postures, those three federal cases, but for a stray sentence of

*dicta* here or there, do not help the appellant's cause. The primary holding of *Ludwig* was that a dog sniff was not a "search" and did not implicate the Fourth Amendment. As to its ability to establish probable cause for a *Carroll* Doctrine search of an automobile trunk, the Tenth Circuit held the following about a sniff by a dog with respect to which no "track record" whatsoever was established:

> Ludwig suggests that dog sniffs are not as reliable as courts often assume, and therefore the dog alert did not give the agents probable cause to open and search Ludwig's trunk.... We ... conclude that the dog alert did give the agents probable cause to search Ludwig's trunk.
>
> ... Although Ludwig cites several cases of mistaken dog alerts, a dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a "fair probability" that there is contraband. *We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures.*

10 F.3d at 1527 (emphasis supplied).

In the *Diaz* case, the defendant contended that because "the government failed to establish the dog's training and reliability," the agents thereby "lacked probable cause to search the car." 25 F.3d at 393. The Sixth Circuit rejected the argument. It, somewhat dubiously, analogized the receipt of evidence at a suppression hearing about a canine "alert" to the receipt of expert opinion evidence at a trial. The court nonetheless accepted the dog's expertise. Any challenge to the dog's competence went only to the weight of the evidence and not to its admissibility. The dog's reliability was not deemed to be a threshold question.

> *When the evidence presented,* whether testimony from the dog's trainer or records of the dog's training, *establishes that the dog is generally certified as a drug detection dog,* any *other evidence,* including the testimony of other experts, *that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog.* ... As

with the admissibility of evidence generally the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

*Id.* at 394 (emphasis supplied).

In the *Wood* case, the District Court engaged in an interesting discussion of why a trained canine is "inherently more reliable" than an informant. Competence aside, dogs are inherently less untruthful than people.

> *[T]he instant court sees a positive alert from a law enforcement dog trained and certified to detect narcotics as inherently more reliable than an informant's tip. Unlike an informant, the canine is trained and certified to perform what is best described as a physical skill. The personal and financial reasons and interest typically behind an informant's decision to cooperate can hardly be equated with what drives a canine to perform for its trainer.* The reliability of an informant is really a matter of forming an opinion on the informant's credibility either from past experience or from independent corroboration. *With a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill.*

915 F.Supp. at 1136 n. 2 (emphasis supplied).

In all three of these federal cases cited by the appellant, we again point out, the challenge to the dog's competence was made at a suppression hearing reviewing warrantless vehicular scans, at which evidence was offered and challenged and received. None of those cases involved the *ex parte* decision to issue a search warrant based on the "four corners" of the warrant application. See *United States v. Kennedy,* 131 F.3d at 1376–78.

In this case, the assertion in the warrant application that "Pfc. Brian's canine is a certified drug detecting dog and scans have resulted in numerous arrests" was facially valid and supported the finding of probable cause. We fully concur with that part of Judge Gelfman's Memorandum Opinion and Order in which she ruled:

*When a canine has been certified in contraband detec-*
*tion, it is not within the magistrate's responsibility or*
*training to re-analyze the statistical record for each canine*
*whose sniff is presented as support for the issuance of a*
*search and seizure warrant,* how the canine signals to its
handler or how long is appropriate for a response to be
made. As in the *Emory* and *Meyer* discussion *supra,* a
magistrate must be able to defer generally to the skill of a
trained handler and the certifying agency unless there is a
clear example of abuse.

(Emphasis supplied).

## 2. The Appellant's Attempt to Stray
## Outside "The Four Corners"

At the outset of the suppression hearing on September 18,
2002, the appellant called, as his witness, Officer Larry Brian,
Alex's handler, and examined at length Alex's record of past
successes and failures. This was a highly unusual procedure
that calls for close scrutiny by us as to why a witness was even
called and for what purpose.

When suppression hearings are conducted to consider the
exclusion of such things as allegedly involuntary confessions or
allegedly unreliable identification procedures, witnesses may
abound. When the Fourth Amendment's exclusionary rule is
invoked for allegedly unreasonable warrantless searches or
seizures, witnesses are regularly called by both State and
defendant. Even in a warranted search situation, witnesses
may be called when the alleged unconstitutionality concerns
the manner of the execution of the warrant.

 When, by stark contrast, the issue being litigated
is the initial issuance of a warrant, ordinarily no witnesses are
ever called and no extraneous evidence is ever produced.
Except in the rare situation, pursuant to *Franks v. Delaware,*
438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in which
the defendant has made a threshold showing that a govern-
mental affiant has perjured himself on a material matter,
there will be no witnesses called. At a suppression hearing

challenging the issuance of a search warrant, the only evidence that should be considered by the court is that which is confined within the "four corners" of the warrant and its application. The hearing, to be sure, may involve extensive legal argument, but it should not involve the taking of any evidence other than the submission of the warrant itself, including its application.

Maryland's steadfast adherence to the "four corners" doctrine dates back to *Smith v. State,* 191 Md. 329, 335, 62 A.2d 287 (1948).

> *[T]he court's consideration* of the showing of probable cause *should be confined solely to the affidavit itself,* and the truth of the alleged grounds stated in the affidavit cannot be controverted by receiving the testimony of the accused and other witnesses.

(Emphasis supplied). See also *Goss v. State,* 198 Md. 350, 354, 84 A.2d 57 (1951); *Adams v. State,* 200 Md. 133, 139, 88 A.2d 556 (1952); *Harris v. State,* 203 Md. 165, 172, 99 A.2d 725 (1953).

In *Tischler v. State,* 206 Md. 386, 390–91, 111 A.2d 655 (1955), Judge Delaplaine wrote for the Court of Appeals:

> [I]f the affidavit that forms the basis for the issuance of a search warrant is sufficient on its face, *any question as to whether the affidavit showed probable cause is confined to the affidavit itself,* and on a motion to quash the search warrant on the ground of lack of probable cause, *no testimony can be received to contradict the truth of the allegations in the affidavit.*
>
> . . . .
>
> [T]he rule is so firmly established in Maryland that it should not be changed by a decision of this Court. We also take occasion to say that this rule has been generally followed in other states.

(Emphasis supplied). See also *Burrell v. State,* 207 Md. 278, 280, 113 A.2d 884 (1955); *Tucker v. State,* 244 Md. 488, 499–500, 224 A.2d 111 (1966).

This Court has also rigorously adhered to the "four corners" doctrine. In *Herbert v. State,* 136 Md.App. 458, 471–72 n. 1, 766 A.2d 190 (2001), we observed:

> [T]he prevailing law in Maryland, since 1948, has been that *the scrutiny of a warrant application, including supporting affidavits, had to be confined within "the four corners" of the supporting affidavit* and that no challenge was permitted to the veracity of a warrant application and its supporting documents.

(Emphasis supplied). See also *Dawson v. State,* 11 Md.App. 694, 714–15, 276 A.2d 680 (1971); *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333 (1969); *Grimm v. State,* 6 Md.App. 321, 326, 251 A.2d 230 (1969); *Hall v. State,* 5 Md.App. 394, 397, 247 A.2d 548 (1968); *Sessoms v. State,* 3 Md.App. 293, 296–97, 239 A.2d 118 (1968); *Scarborough v. State,* 3 Md.App. 208, 211–12, 238 A.2d 297 (1968).

As we have already analyzed at length, an examination of the "four corners" of the warrant application in this case 1) led Judge Gelfman to rule that there was a "substantial basis" for Judge Ellinghaus–Jones to have issued the search warrant and 2) leads us to hold that Judge Gelfman was not in error in that regard. What remains for us to decide is whether even to consider the appellant's statistical argument as to Alex's "track record" based on the testimony of Officer Brian at the suppression hearing.

 Although a cursory glance at the appellant's statistical argument leads us to conclude that, were we to address it, we would probably find it to be without merit, our holding is that the statistical argument and the testimony of Officer Brian were immaterial and had no basis even being received at the suppression hearing.

If the field of scrutiny is to be expanded beyond the "four corners" of the warrant and warrant application, it is incumbent on the appellant to establish a sound basis for such a departure from the norm. He has not done so. If the suppression hearing in fact broadened the inquiry beyond that to which the appellant was entitled, he got more than he

deserved. We, however, see no reason to assess an immaterial argument or an immaterial ruling on a purely gratuitous inquiry.[1]

### 3. The *Franks* Hearing That Never Was

■■ The appellant contends that all references in the warrant application to Alex's "alert" to Apartment A should have been excised therefrom because of his compelling demonstration (although it did not persuade Judge Gelfman), at a *Franks v. Delaware* taint hearing, that the affiant on the warrant application had been guilty of such deliberate and misleading material omissions of Alex's past failures that, had they been known, they would have decisively undermined Alex's reliability.

---

**1.** If it had been necessary for us to examine the merits of Alex's "track record" as it was developed at the suppression hearing, several interesting questions would have arisen. In the caselaw generally, a dog's "track record" is established at the training academy at the time of the dog's initial certification or at subsequent recertifications. The circumstances of each "alert" are known to and controlled by the trainer. Successes and failures are easy to measure.

Is it similarly possible, however, to measure the "track record" on the job? Is the absence of drugs in the place searched, for instance, to be counted as a "failure" if the search follows the dog's "alert" by days or even by weeks and the possibility exists that the drugs were once present but have been removed? Will corroborative evidence that drugs were earlier present transform a "failure" into a "success?" Is the absence of such corroboration dispositive of the fact that a "failure" occurred? Apparently, the Westminster Kennel Club Rule Book has yet to be written as to how investigative batting averages are compiled. This would seem to make it a particularly inappropriate subject for a judge's *ex parte* review of a warrant application.

Another curiosity in the caselaw is the lofty batting average that seems to be taken for granted as a relevancy requirement. An "alert" for drugs by a dog with a 95% accuracy record would seem, at first glance, to be sufficient at trial to establish a defendant's guilt for possession beyond a reasonable doubt, even without a confirmatory follow-up search. Is it illogical to suggest that a dog's likelihood of being accurate should correspond to the burden of persuasion at issue? If probable cause, for instance, could be quantified as a 35% likelihood that drugs were present, would not an "alert" by a dog that was accurate 35% of the time *ipso facto* satisfy that degree of likelihood? There are some very interesting questions, but they are not before us in this case.

As Alice might have observed in Wonderland, the appellant's contentions are "getting curioser and curioser." **What *Franks v. Delaware* taint hearing?** The appellant has simply conjured up out of thin air a *Franks v. Delaware* taint hearing that never was. A *Franks v. Delaware* taint hearing was never conducted in this case. A *Franks v. Delaware* taint hearing was never even requested in this case. Where does one begin to refute, or even to pin down, a fluid and shifting phantasmagoria?

The fact that the appellant was permitted to go outside the "four corners" of the warrant application and to question Officer Brian about Alex's training and track record, for another purpose pursuant to a different request, does not cause a *Franks v. Delaware* taint hearing suddenly to materialize. It is not enough to proclaim, "Voila!" The appellant requested and, in a burst of apparently excessive generosity, was granted a hearing, pursuant to the so-called *Frye–Reed* test of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). It was a hearing at which to challenge the general acceptance in the scientific community of dog sniffing as an investigative modality. Now, in an Orwellian rewriting of the case's history, the appellant treats that *Frye–Reed* hearing as if it had been a *Franks v. Delaware* taint hearing.

We will defer for the moment our opinion as to the propriety of a *Frye–Reed* hearing in the course of a challenge to the issuance of a search warrant, while we try first to exorcize the demon of *Franks v. Delaware* that the appellant has conjured up. In 1978, in *Franks v. Delaware,* the Supreme Court carved out the only known exception yet extant to confining a challenge to the issuance of a search warrant to the "four corners" of the warrant application. Again and again, it has been stressed that a *Franks* hearing is a rare and extraordinary exception 1) that must be expressly requested and 2) that will not be indulged unless rigorous threshold requirements have been satisfied.

The Supreme Court, 438 U.S. at 155–56, 98 S.Ct. 2674, established a formal threshold procedure before a defendant will be permitted to stray beyond the "four corners" of a warrant application to examine live witnesses in an effort to establish that a warrant application was tainted by perjury or reckless disregard of the truth.

> *[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,* and if the allegedly false statement is necessary to the finding of probable cause, *the Fourth Amendment requires that a hearing be held at the defendant's request.* In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

(Emphasis supplied).

The Supreme Court expressly set out the daunting threshold that must be crossed before such a taint hearing will be permitted.

> *To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimed to be false; and *they should be accompanied by a statement of supporting reasons.* Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. *Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today*

*is only that of the affiant, not of any nongovernmental informant.*

438 U.S. at 171, 98 S.Ct. 2674 (emphasis supplied).

In *McDonald v. State,* 347 Md. 452, 471–72 n. 11, 701 A.2d 675 (1997), Judge Raker for the Court of Appeals reconfirmed these preconditions that must be satisfied before a defendant is even entitled to a hearing.

*Franks v. Delaware set out a procedure, requiring a detailed proffer from the defense before the defendant is even entitled to a hearing to go behind the four corners of the warrant.* Under *Franks,* when a defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included false statements in the supporting affidavit for a search warrant, and that the affidavit without the false statement is insufficient to support a finding of probable cause, the defendant is then entitled to a hearing on the matter. *The burden is on the defendant to establish knowing or reckless falsity by a preponderance of the evidence* before the evidence will be suppressed. *Negligence or innocent mistake* resulting in false statements in the affidavit *is not sufficient* to establish the defendant's burden.

(Emphasis supplied).

In *Yeagy v. State,* 63 Md.App. 1, 8, 491 A.2d 1199 (1985), Judge Rosalyn Bell first recognized for this Court the threshold requirements that must be satisfied.

To challenge an omission under *Franks, supra,* the accused must make a preliminary showing that it was made intentionally or with reckless disregard for accuracy; a negligent or innocent mistake does not suffice. *United States v. Martin,* 615 F.2d [318, 329 (5th Cir.1980)]; *United States v. House,* 604 F.2d [1135, 1139 (8th Cir.1979)]. This must be established by a preponderance of the evidence.

See also *Emory v. State,* 101 Md.App. 585, 631–33, 647 A.2d 1243 (1994); *Wilson v. State,* 132 Md.App. 510, 538, 752 A.2d 1250 (2000) ("A suppression hearing and a *Franks* hearing are, albeit related, very different animals.").

*Wilson v. State, supra,* was a case in which the correction of course by the suppression hearing judge came late in the

game, but it nonetheless came in time. We agreed that a *Franks v. Delaware* issue had no business being conducted even though witnesses had actually been called and argument had actually been made just as if a proper *Franks v. Delaware* hearing were being held. "Although the appellant never formally requested a *Franks* hearing and never made the required threshold showing that might have entitled him to a *Franks* hearing, he nonetheless received the full procedural benefit of a *Franks* hearing." 132 Md.App. at 538, 752 A.2d 1250. The appellant there was not "confined to arguing within the four corners of the application for the ... warrant." *Id.* He "had the benefit of cross-examining at length" the detective "who was the affiant on the warrant." *Id.* All of this, however, turned out to be gratuitous and was not properly before the court. It did not ripen into an entitlement just because it happened. As we observed:

> [O]nly because of the stubbornly persistent argument of appellant's counsel, the specter of *Franks v. Delaware* hovers about this case although it was never formally established that *Franks v. Delaware* had any business in this case.

*Id.*

When it came time for her ultimate ruling, however, the trial judge recognized that *Franks v. Delaware,* indeed, had no business being in the case and she scrupulously confined her probable cause analysis to the "four corners" of the application.

At the end of the somewhat hybrid suppression hearing, *Judge Kavanaugh recognized* what defense counsel wanted her to do. *In the last analysis, however, she agreed with the State that the decision as to whether the 1991 warrant application spelled out probable cause was one that should be made by looking "at the four corners" of that warrant application.*

132 Md.App. at 541, 752 A.2d 1250 (emphasis supplied).

 The trial judge, notwithstanding the witnesses and the argument, made no rulings pursuant to *Franks v. Delaware.* We, in turn, held that none were required:

Judge Kavanaugh never determined by a bare preponderance of the evidence or by any other standard whether 1) any statement in the warrant application by Detective Pikulski had been made with reckless disregard for its truth or 2) if so, whether that particular statement was indispensable to the establishment of probable cause. It is our conclusion that *no such rulings were required.* In any event, *Judge Kavanaugh's final ruling was of the type ordinarily made at a routine suppression hearing and was not a Franks ruling.*

*Id.* at 541–42, 752 A.2d 1250 (emphasis supplied). In reaffirming the principle that qualifying for a *Franks* hearing is "a formal procedure that must be satisfied" and not something that a suppression hearing may simply carelessly or inadvertently lapse or slide into, we stated:

*Franks v. Delaware* established *a formal procedure that must be satisfied before a defendant will be permitted to look beyond the four corners of a warrant application and to examine live witnesses* in an effort to establish that a warrant application was tainted by perjury or reckless disregard of the truth.

132 Md.App. at 538, 752 A.2d 1250 (emphasis supplied).

The appellant's *Franks v. Delaware* argument in this case is even more bereft than the one we found wanting in *Herbert v. State,* 136 Md.App. 458, 470–74, 766 A.2d 190 (2001). The appellant in that case, like the appellant in this case, was simply stumbling into a *Franks v. Delaware* argument:

What the appellant seems to have been teetering toward, without ever plotting a clear or steady course in that direction, was some sort of a "taint hearing" within the contemplation of Franks v. Delaware. Without any preliminary argument or announcement of purpose, appellant's counsel proceeded to call five witnesses, including the appellant, to the stand.

136 Md.App. at 471–72, 766 A.2d 190 (emphasis supplied). We commented, 136 Md.App. at 472 n. 2, 766 A.2d 190, on the formlessness of the approach.

What the appellant thought he was doing is by no means clear. *One does not just stumble into a Franks hearing casually, let alone inadvertently.* That is why *Franks* makes repeated references to the fact that *"a sensible threshold showing is required"* and that the "requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing." *The appellant here did not even pause at the threshold.*

(Emphasis supplied).

We pointed out that although the appellant in fact called witnesses, he had never satisfied the indispensable threshold requirements.

Not only did the appellant never mention *Franks v. Delaware* specifically or a "taint hearing" generally, he never attempted to make the threshold showing, required by *Franks,* even to be entitled to a hearing that went beyond argument confined to the "four corners" of the warrant.

136 Md.App. at 473 n. 5, 766 A.2d 190. The holding of this Court, 136 Md.App. at 473–74, 766 A.2d 190, was that, even though witnesses had testified, the merely hypothetical merits of a *Franks v. Delaware* taint hearing, which the appellant had never expressly requested and to which he had not established his entitlement, were not properly before us and we, therefore, declined to address them.

*The appellant was apparently attempting to establish through extrinsic evidence, presumably under Franks v. Delaware, that a key allegation in the warrant application was false and that the entire warrant application was thereby tainted.* Arguably (although it was never argued), that controverting of the information in the affidavit could have been used in an effort to show not that Officer Satterfield was necessarily lying about having observed the controlled buy generally but at least that his informant was lying about having made the controlled buy from the appellant personally.

*The appellant, however, never made an argument based on Franks v. Delaware. It is, therefore, unnecessary to point out the ways in which the appellant's possible Franks v. Delaware argument, if indeed that is what he was intending to make, was flawed* for that potential argument has now been abandoned.

(Emphasis supplied).

When it comes to qualifying for a *Franks v. Delaware* hearing, the appellant must turn square corners. There was no *Franks v. Delaware* taint hearing in this case and there should have been none. We will not, therefore, address the appellant's present contention in terms of *Franks v. Delaware*.

### 4. A Procedural Masquerade: *Franks v. Delaware* Disguised As *Frye–Reed*

What the appellant did do was to attempt to slip past an unsuspecting doorman a *Franks v. Delaware* hearing disguised as a *Frye–Reed* hearing. Even once inside the ballroom, the *Frye–Reed* masquerade continued, and it is only now on appeal that the disguise is finally discarded. The appellant seeks, in retrospect, to transmogrify a *Frye–Reed* hearing that was requested into an imagined *Franks v. Delaware* hearing that was not.

The *Frye–Reed* disguise was initially beguiling, even if not legally sound. On August 16, 2002, the appellant filed a Motion for a Hearing on the Scientific Reliability of the Canine Sniff. Citing *Frye v. United States, supra; Reed v. State, supra; Hutton v. State,* 339 Md. 480, 663 A.2d 1289 (1995); *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and Maryland Rule 5–702, the appellant sought a hearing at which he proposed "to introduce evidence to debunk the myth of infallibility of canine sniffs." The motion cited a number of federal cases broadly calling into general question the investigative technique of canine sniffing.

Although the appellant's presentation at the suppression hearing soon reduced itself not to a broad attack, pursuant to

the *Frye–Reed* test, on the general acceptance of the investigative technique by the relevant scientific community but simply to an *ad hoc* challenge to the training and reliability of Alex specifically, the focus nonetheless remained on the reliability of the result.

Even if a *Frye–Reed* test ruling were before us on its merits, (it is not), the appellant's case would not lift off the ground. If we were to assume, *arguendo,* that the olfactory sensitivity of dogs is a new scientific technique (a dubious proposition), the *Frye–Reed* test is concerned only with the general scientific acceptance of the technique and not with the *ad hoc* reliability of a particular dog on a particular occasion. In *Reed v. State,* 283 Md. at 381, 391 A.2d 364, Judge Eldridge made the sweeping nature of the inquiry unmistakably clear.

> *The question of the reliability of a scientific technique or process is unlike the question,* for example, *of the helpfulness* of particular expert testimony *to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case.* It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established.

(Emphasis supplied).

A more fatal blow to the appellant's cause, were a *Frye–Reed* issue actually before us, would be that this entire line of inquiry concerns the ultimate admissibility of evidence at a trial. *Frye–Reed* law has no remote applicability to what a warrant-issuing magistrate may consider on the purely *ex parte* decision of whether there is a "substantial basis" to issue a warrant. The very concept of imposing a sophisticated *Frye–Reed* inquiry onto a magistrate's *ex parte* review of a warrant application is ludicrous. As we explained at greater length in *Emory v. State,* 101 Md.App. at 635, 647 A.2d 1243,

extended and probing inquiries may challenge the admissibility at trial of such evidence as a defendant's or a codefendant's allegedly involuntary confession, an allegedly unreliable identification procedure, prior criminal records, or alleged hearsay evidence, but such evidence is, generally speaking

> standard fare in a warrant application. The warrant-issuing process is *ex parte* and is far less formal than a courtroom proceeding.

*Id.*

In her Memorandum Opinion and Order, Judge Gelfman recognized the inappropriateness of applying the "standard used ·for scientific evidence" at trial to the very different assessment of "the probable cause necessary for a search and seizure warrant."

> *Defendants question the scientific reliability of canine sniffs and request that this Court analyze it under the standard used for scientific evidence.* As has been discussed, *supra,* the use of a canine in contraband detection is well established in Maryland. *This Court finds no need to investigate the statistical accuracy when it is not being introduced as evidence to prove the truth of the matter at hand.* The canine sniff, in the case *sub judice,* was not used to justify an arrest, or even a warrantless search. *It was an investigative tool used only to·obtain the probable cause necessary for a search and seizure warrant.*

(Emphasis supplied).

 A suppression hearing challenging the sufficiency of a warrant application is simply not the proper forum for a hearing pursuant to *Frye–Reed.* Even if the appellant had been in the right pew, he was procedurally in the wrong church. The short answer to the *Frye–Reed* issue, however, is that it has not been raised on appeal. In neither the appellant's brief nor his reply brief is there so much as a citation to *Frye* or to *Reed* or to any of the *Frye–Reed*-related cases.

Conversely, there was no mention at the suppression hearing of *Franks v. Delaware.* The appellant's now feeble response to the foreclosing effect of a *Franks v. Delaware*

hearing's having been neither requested nor generated nor granted is to point out that a footnote in the State's brief mentions that "Fitzgerald got something resembling a *Franks* hearing—when he was able to examine witnesses at the suppression hearing." The reply brief also refers to the fact that at the beginning of the suppression hearing the prosecutor advised Judge Gelfman that "counsel and the State did discuss the fact that there was going to be testimony ... going outside the four corners of the warrant."

We observe preliminarily that the State's apparent acquiescence to "testimony going outside the four corners of the warrant" by no means necessarily refers to testimony in the context of a *Franks v. Delaware* hearing, that was never requested, versus testimony in the context of a *Frye–Reed* hearing, that was requested. More to the point, however, it is not in any event within the prerogative of the State to grant or to accede to a *Franks v. Delaware* taint hearing to which the defendant himself has not established his formal entitlement.

No *Franks v. Delaware* issue is before us in this case. Alex's olfactory reliability was unimpeached, and Judge Gelfman's ruling on there having been a "substantial basis" for the issuance of the warrant is unimpeached.

### Interlude:

### What We Have Held And What We Have Not Held

Notwithstanding our extended discussion, we have not at this point held that the search warrant was necessarily valid. Our limited holding, thus far in the analysis, is that that presumptively valid search warrant issued on March 21 by Judge Ellinghaus–Jones 1) was not facially inadequate and 2) has not been invalidated by any extrinsic factor coming in from outside the "four corners" of the warrant application.

The appellant's third sub-contention (his fourth sub-contention is but a spin-off from the third), by contrast, requires us to turn to the very different question of whether that March 21 warrant may have been tainted by some intrinsic factor

within the "four corners" of the warrant application. The contrast can be significant, because such an examination may call for the use of a distinctly different set of analytic tools and procedures.

## Part II

### The Warrantless Activity of March 19

**A. The Appellant's Challenge to the Antecedent Police Action of March 19.**

The appellant claims that the police, without Fourth Amendment justification, conducted a warrantless search of his residence on March 19. He claims that that unconstitutional violation of his Fourth Amendment rights calls for the exclusion of the evidence produced by that search, to wit, that the State may not offer at trial Alex's indication that the residence contained contraband. Thus far, there is no problem, because the State did not offer such evidence at a trial on the merits.

The appellant's exclusionary motion, however, is more far reaching. He claims that just as the State may not offer any direct evidence emanating from the unconstitutional search of March 19, neither may it offer derivative evidence proceeding from that same source. He invokes, in effect, the "fruit of the poisoned tree" doctrine of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He claims that the probable cause that led to the issuance of the March 21 search warrant was the unattenuated "fruit of the poisoned tree" and that the search warrant itself, therefore, was unconstitutionally tainted derivative evidence.

**1. Readjusting the Fourth Amendment Standard of Review**

As our focus shifts from the issuance of the search warrant on March 21 to the warrantless police conduct of March 19, our framework of potential Fourth Amendment analysis must

undergo a radical readjustment. If it should eventuate that, in answer to our threshold question, the Fourth Amendment is in fact applicable to the police actions of March 19, then the standards by which we would assess whether the Fourth Amendment had been satisfied would differ markedly from the standards we earlier invoked to assess the facial sufficiency of the search warrant.

### a. In a Single Suppression Hearing A Judge May Play Different Roles

The shift in focus from the issuance of the warrant on March 21 to the warrantless activity of March 19 was of significance to Judge Gelfman, just as it is to us. In reviewing the warrantless actions of March 19, she was the judge of first impression, called upon to make legal rulings and, when necessary, to make findings of fact. Upon appellate review, the appellate court, except when called upon to make ultimate *de novo* determinations, focuses only on the correctness of the suppression hearing judge's decisional process and does not substitute its judgment for that of the suppression hearing judge on the factual merits. The appellate focus is on the decision of the suppression hearing judge.

When, by contrast, the subject before the suppression hearing is the issuance of a warrant, as it partially was in this case, the focus of both the suppression hearing court and the appellate court shifts dramatically. With respect to the warrant that was issued on March 21, Judge Gelfman was not the judge of first impression. Judge Ellinghaus–Jones was, and Judge Gelfman, like us, sat only in a far more restrained reviewing capacity, subject to the typical appellate disciplines. Whether she herself would have issued the warrant was beside the point, just as whether we would have issued the warrant is beside the point. All that mattered was that Judge Ellinghaus–Jones had had a "substantial basis" to justify her having done so.

Upon appellate review of the issuance of a warrant, we do not so much review the decisional process of the

suppression hearing judge as we sit in the place of the suppression hearing judge. Our primary focus, as was the focus of Judge Gelfman, is upon the warrant-issuing magistrate and the "substantial basis" *vel non* for her decision. In this case, Judge Gelfman not only switched roles at the proper time but played both roles admirably.

With respect to the warrantless dog sniffing of March 19, by contrast, Judge Gelfman was the decision maker of first impression. Our focus, accordingly, shifts to the propriety of her decision as to the dog sniffing of March 19.

### b. For Warrantless Searches, A Counter Presumption

In attacking the facial sufficiency of the March 21 search warrant, the appellant bore the burden of proof. The warrant was presumptively valid and the burden of rebutting that presumptive validity was on him. With respect to the warrantless police activity of March 19, by contrast, the Fourth Amendment presumption is that a warrantless search, if such a search occurred, was unreasonable. The burden, accordingly, would shift to the State to rebut that presumption and to establish that the search was reasonable.

This Court analyzed the shifting of presumptions in *Herbert v. State,* 136 Md.App. 458, 493–94, 766 A.2d 190 (2001):

> Let one critically different fact be established, however, and the burdens shift dramatically.... When the State has procured evidence of guilt via the disfavored or non-preferred modality of a warrantless search, it is the State that suffers *the disincentive of a presumption of invalidity.* It is the State that then must assume the burden of rebutting that presumption of invalidity and of proving that the warrantless search was somehow justified under one of the "jealously guarded" exceptions to the warrant requirement.

> The reversible tilt of the playing field is clear. If it is established that a search was pursuant to a judicially issued warrant but the record is utterly silent as to the justification for the warrant, the State enjoys a presumption as to its validity and the defendant, having failed to carry the burden

of rebuttal, loses the nothing-to-nothing tie. *If, on the other hand, it is established that the search was warrantless and the record is utterly silent as to the justification for the warrantless search, the defendant enjoys a presumption as to its invalidity and the State, having failed to carry its burden of rebuttal, loses that nothing-to-nothing tie.*

(Emphasis supplied). See also *State v. Riley,* 147 Md.App. 113, 120, 807 A.2d 797 (2002).

### c. The *Sheppard–Leon* "Good Faith" Exemption Is Limited to the Execution of a Warrant

■ Another major difference between how an appellate court (or a trial court) assesses warranted versus warrantless Fourth Amendment activity is with respect to the availability, as a backstop position, of the "good faith" exemption from the Exclusionary Rule promulgated by *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Because the only purpose of the Exclusionary Rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is to deter unreasonable police behavior, *Leon* and *Sheppard* held that a mistake made by a judge in issuing a warrant should not be attributed to the police officer who executes it. Because the officer has been reasonable in relying on the judge's legal expertise, it would serve no deterrent purpose to exclude otherwise competent, material, and trustworthy evidence. See *Connelly v. State,* 322 Md. 719, 720–21, 589 A.2d 958 (1991).

■ In keeping with the *Leon–Sheppard* rationale, it is appropriate for us at this juncture to announce our alternative partial holding. Even if our earlier holdings (in Parts IA and IB of this opinion) that the search warrant of March 21 was inherently valid were, *arguendo,* in error, we would still affirm Judge Gelfman's decision not to suppress the evidence. We would give the police, as they executed the judicially issued warrant on April 2, the benefit of the *Leon–Sheppard* "good faith" exemption from the Exclusionary Rule.

█ The *Leon–Sheppard* exemption, however, is not available to salvage possible judicial error with respect to warrantless searches, such as the dog sniffing of March 19. This exception to the "good faith" exemption obtains even in the two-stage situation where the tainted derivative fruit of an earlier Fourth Amendment violation is itself a search warrant.

█ Although *Williams v. State*, 372 Md. 386, 418–20, 813 A.2d 231 (2002); *Holmes v. State*, 368 Md. 506, 515–16, 796 A.2d 90 (2002); and *United States v. Karo*, 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) do not expressly address the hierarchal relationship between 1) the requirement of factoring out Fourth Amendment tainted information from a warrant application and 2) "good faith" police reliance on even an erroneously issued warrant, they represent an imposing predicate from which the conclusion may readily be drawn that in the case of an antecedent Fourth Amendment violation which contributes to a warrant application, the "fruit of the poisoned tree" doctrine "trumps" the officer's "good faith" reliance under *Leon* and *Sheppard*. See also *State v. Johnson*, 110 Idaho 516, 716 P.2d 1288, 1298–1300 (1986); *State v. DeWitt*, 184 Ariz. 464, 910 P.2d 9, 14–15 (1996); *State v. Carter*, 69 Ohio St.3d 57, 630 N.E.2d 355, 362–64 (1994); *State v. Scull*, 639 So.2d 1239, 1245 (La.App.1994); *United States v. Villard*, 678 F.Supp. 483, 490 (D.N.J.1988).

### 2. The Threshold Requirement Of Fourth Amendment Applicability

The preceding discussion as to the more favorable standard of review that the appellant might enjoy with respect to the assessment of the warrantless police activity of March 19 is dependent, of course, on the threshold determination of whether the Fourth Amendment even applies to the activity of March 19. If the Fourth Amendment covers those actions, we will review that warrantless activity by the more defendant-favorable standard. If, on the other hand, the Fourth Amendment does not apply, the discussion about appropriate standards of review is beside the point.

Any standard of Fourth Amendment review is utilized simply to determine whether the Fourth Amendment, when applicable, has been satisfied or violated. When the Fourth Amendment is deemed inapplicable, however, it self-evidently can be neither satisfied nor violated. It is immaterial. The most vexing impediment to clean Fourth Amendment analysis is the failure to keep separate and distinct the very different questions of 1) the Fourth Amendment's coverage and 2) the Fourth Amendment's merits.

In *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), Justice Scalia acknowledged this distinction between Fourth Amendment satisfaction and Fourth Amendment applicability. He pointed out that, under the Fourth Amendment, "the question whether a warrantless search of a home is reasonable" is relatively simple, but "the antecedent question of whether or not a Fourth Amendment 'search' has occurred is not so simple." 533 U.S. at 31, 121 S.Ct. 2038.

Before plunging uncritically into the value-laden inquiry of whether the police behaved reasonably, the critical mind should always pause at the threshold and ask why it is in the first place that the police are required to behave reasonably. The answer is because, in many of the situations that come before our courts, the Fourth Amendment demands that they behave reasonably. When, therefore, the Fourth Amendment applies, the commandment to the police or other governmental agents to search reasonably applies as well. The flip-side of the same logic, however, is that in a situation in which, for various reasons, the Fourth Amendment does not apply, neither do the values by which we measure Fourth Amendment satisfaction when it does apply.

Every Fourth Amendment analysis should begin with two absolutely basic, but absolutely different, questions:

## 1. DOES IT APPLY?

(Do not go on to Question # 2 unless the answer to Question # 1 is "yes.")

## 2. IF SO, HAS IT BEEN SATISFIED?

What then are the ways in which the Fourth Amendment sometimes does not apply?

### a. The Coverage of the Place Searched

 Sometimes the Fourth Amendment does not cover the place where the search occurs, such as Mexicali, Mexico, *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), or the "open fields" beyond a curtilage, *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). When such a determination of non-coverage is made at the very threshold of inquiry, the Fourth Amendment analysis is over. We do not go on to inquire into whether the Fourth Amendment might have been satisfied or might have been violated in some other place where it did apply, if in the place where the search actually occurred it did not apply.

### b. The Coverage of the Person of the Searcher (State Action)

 Another but completely unrelated variety of Fourth Amendment inapplicability concerns the non-coverage of the person of the searcher. The Fourth Amendment, as indeed all of the Bill of Rights, is a limitation on the actions of government and not a command to private citizens. It has always been recognized that the restraints of the Fourth Amendment apply only to agents of government (including those acting in cooperation with them) and not to searches or seizures carried out by private persons. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). When the threshold inquiry, therefore, determines that the Fourth Amendment does not apply to the person of the searcher, once again the Fourth Amendment analysis is over. We do not go on to inquire into the reasonableness of private searches that are beyond the purview of the Fourth Amendment.

### c. The Coverage of the Person of the Defendant (Standing)

A third distinct variety of Fourth Amendment inapplicability is the non-coverage of the person of the defendant. This is a roundabout way of referring to the subject known more familiarly as standing to object. If the defendant has no Fourth Amendment interest in the thing seized or the place searched, the defendant is barred, at the threshold, from raising the issue of the Fourth Amendment merits, whatever those merits might have been with respect to someone else. *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

### d. The Coverage of the Police Conduct (Was It a Search? Was It a Seizure?)

The most recent variety of Fourth Amendment inapplicability to have made its appearance is the non-coverage of the police behavior in question. The overarching limitation is that the Fourth Amendment, by its very terms, covers "unreasonable searches and seizures" but not other forms of arguably unreasonable police behavior. If, therefore, the police action in question does not constitute a "seizure" within the contemplation of the Fourth Amendment, *United States v. Jacobsen, supra; California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), or a "search" within the contemplation of the Fourth Amendment, *United States v. Jacobsen, supra; Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), once again the Fourth Amendment analysis is over and the merits, whatever they might otherwise have been, are immaterial.

There are, then, at least four distinct varieties of Fourth Amendment inapplicability:

1. The non-coverage of the place,
2. The non-coverage of the searcher,

3. The non-coverage of the defendant, and

4. The non-coverage of the police conduct.

Each of those threshold questions requires an objective measurement of Fourth Amendment coverage that does not vary with the facts of a particular case. That the degree of unreasonableness might seem to be greater in some than in other cases does not operate to expand the coverage. The antecedent coverage is a constant unaffected by Fourth Amendment values. The Fourth Amendment is the vehicle that carries its values within it. It is not the product of these values.

### e. The Impact of *Katz*

The impact of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), on this threshold issue of Fourth Amendment applicability has been only incidental. Post-*Katz*, it is now fashionable to pose the question of Fourth Amendment coverage in terms of a "reasonable expectation of privacy." The two terms mean the same thing. If there is a reasonable expectation of privacy, there is, *ipso facto*, Fourth Amendment coverage. If there is no reasonable expectation of privacy, *ipso facto*, there is no Fourth Amendment coverage.

The *Katz* reasonable expectation of privacy inquiry, in turn, breaks down into two sub-inquiries:

1. Was there a *subjective* expectation of privacy actually in the mind of the defendant?

2. Is that expectation one that society, *objectively*, considers reasonable?

At that point in the *Katz* outline, the older and traditional varieties of Fourth Amendment applicability reappear as the key ways in which we measure whether society objectively considers the defendant's expectation of privacy to be reasonable. The ancient verities of Fourth Amendment applicability, therefore, still abide. They have not been displaced by *Katz*. They have simply been indented and moved one step further down in the post-*Katz* outline.

### f. The Standard of Review for Assessing Applicability

Once again, some adjustment is required in the type of scrutiny an appellate court brings to bear on the threshold issue of Fourth Amendment applicability. In taking that purely objective measurement, we refrain from making any Fourth Amendment value judgments as to the police activity before us.

When the Fourth Amendment has been determined to apply, we, of course, enforce the values which the Fourth Amendment prescribes. We prefer, and sometimes demand, 1) warrants rather than warrantless searches, 2) probable cause or reasonable suspicion rather than "fishing expeditions," 3) exigency rather than police laziness as a reason for departing from the norm, and 4) police good faith rather than police bad faith. What, however, are all of those things in the aggregate? They are simply the sub-criteria by which we measure police reasonableness. When, therefore, the Fourth Amendment applies, the commandment to be reasonable *ipso facto* applies and all of the sub-criteria by which we measure reasonableness are very material.

When, by diametric contrast, the Fourth Amendment is determined to have no applicability to the situation under review, we are in the coldly neutral world of outer space, in which there is no Fourth Amendment commandment to be reasonable and in which the sub-criteria for measuring reasonableness are utterly immaterial. It is necessary to bring to bear on the threshold question of applicability, therefore, a totally different mind set than judges are used to focusing on the value-laden question of Fourth Amendment satisfaction. On the latter issue, the courts are the keepers of our society's sacred flame and moral judgments about governmental conduct are appropriate; on the former, by contrast, the courts are only cartographers mapping out a boundary line, a function in which moralizing has no part.

This shifting of standards is a challenge for appellate reviewers. There is one standard for assessing Fourth Amendment applicability. There is a second standard for

reviewing, under the Fourth Amendment, judicially issued search and arrest warrants. There is yet a third standard for reviewing, again under the Fourth Amendment, warrantless police activity. The challenge is to take down from the shelf the appropriate microscope on a particular occasion before proceeding to examine the specimen on the table. The challenge is to get into the right mind set before making a judgment.

### g. The Burden of Proof as to Applicability

 On the threshold issue of Fourth Amendment applicability, moreover, the burden of proof is clearly on the defendant to establish that applicability. *Rakas v. Illinois,* 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("Petitioner ... bears the burden of proving not only that the search of Cox's purse was illegal, but also that he had a legitimate expectation of privacy in that purse."); *Jones v. United States,* 362 U.S. 257, 261–62, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Miller,* 425 U.S. 435, 441–42, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). See also *United States v. Ludwig,* 10 F.3d 1523, 1526 (10th Cir.1993) (The defendant "bears the burden of proving not only that the search was illegal, but also that he had a legitimate expectation of privacy in the parking lot."); *United States v. Reed,* 733 F.2d 492, 501 (8th Cir.1984) ("Whether a police officer has commenced a 'search' turns not on his subjective intent to conduct a search and seizure, but rather whether he has in fact invaded an area in which the defendant harbors a reasonable expectation of privacy.").

This Court itself was very clear as to the allocation of the burden of proof on the threshold issue of Fourth Amendment

coverage in *Burks v. State*, 96 Md.App. 173, 195, 624 A.2d 1257, *cert. denied*, 332 Md. 381, 631 A.2d 451 (1993):

> The coverage of the Fourth Amendment is an issue that is analyzed objectively by the judge on the basis of all that is known at the time of the suppression hearing or of the trial. The burden of showing Fourth Amendment coverage is, of course, upon the appellant.

The variety of Fourth Amendment applicability that concerns us in this case is the coverage of the police behavior on March 19. More specifically, the issue is whether the dog sniffing on that day was a "search" within the contemplation of the Fourth Amendment. If it was, the police needed a justification for it. If it was not, the question of justification is moot.

### 3. The Launching Pad From Which The Dog Sniffing Was Conducted: The Non–Coverage of the Place

 One preliminary question can be disposed of summarily. It is a classic instance of the inapplicability of the Fourth Amendment because of the non-coverage of the place in which the challenged police activity occurred. On March 19, Officer Brian and Detective Grim, with Alex in tow, entered the apartment building designated as 3131 Normandy Woods Drive. It is a brick structure. Officer Brian described how the police team entered through glass doors into a common area that he characterized as a "vestibule." He explained that the "door is not locked" and that "you don't have to be buzzed in." Within that vestibule or common area were mailboxes and a stairwell leading to upper floors. On the main floor and accessible from that vestibule were Apartments A and B. Apartments C and D were "upstairs one flight of stairs." Officer Brian "believed there was another set of apartments on the third [level], up one more flight."

Officer Brian explained the technique he used in conducting Alex's dog sniff.

> I started on apartments C and D, which are the second, second level. I get Alex. I do what I have to do with Alex,

and I gave him his command for searching for narcotics. I then presented the base of the door to apartment C with no alert. I then moved to apartment D, presented him with the door, he sniffed the area of the base of the door with no alert. I then moved downstairs to the target apartment, which was target A. Presented the base of the door, which he sniffed, and then gave an alert. I then gave Alex his reward, which is standard practice for what we do. Took his reward back, and then presented apartment B door to him, which he scanned with no alert. At that time I exited, placed canine Alex back in my vehicle and then advised Detective Grim of the results of the scan.

We fully concur in Judge Gelfman's ruling that the common area or vestibule of the apartment building was not a place enjoying Fourth Amendment protection.

*Defendants argue* that this expectation of privacy was violated by the canine sniff performed outside the door of their apartment and state *that it is discriminatory to treat residents of apartment complexes differently from residents of detached homes.* This Court's analysis on the expectation of privacy one has at the door of his/her residence does not rely on whether such a residence is an apartment, a townhouse, a single-family detached dwelling or otherwise. Instead, this Court looks to the undisputed testimony that *the glass entry door was unlocked, leaving the common area, mailbox area, and hallway outside the subject apartment door open to the public.*

There was no evidence presented that Defendants, or any other residents for that matter, had taken any steps to restrict access to the hallway and common area. *It is therefore considered no differently by this Court than if access to a sidewalk, walkway, or stoop outside another form of housing was open and available to the public* and not restricted in some fashion. To this end, the Court follows Maryland precedent in finding that *there was no expectation of privacy in the common area outside the Defendants' door. See Eisenstein v. State,* 200 Md. 593, 600, 92 A.2d 739 (1952) (finding a vestibule to be a public

hallway because the entrance door was unlocked, mail was left inside the vestibule, and that everyone entering the apartment building used this vestibule as the public entrance).

(Emphasis supplied).

Although *Eisenstein v. State,* 200 Md. 593, 92 A.2d 739 (1952), was admittedly a case dealing with trespass law rather than with the geographic coverage of the Fourth Amendment, it nonetheless sheds light on the necessarily involved question of whether Officer Brian, Detective Grim, and Alex had the legal right on March 19 to be within the vestibule of 3131 Normandy Woods Drive.

> The appellant claims that the officers were trespassers in this vestibule, *ab initio.* We cannot so find.... The evidence here is without contradiction that on the day of the alleged offense the nameplates under the doorbells at the entrance door could not be read. The entrance door was unlocked and led to the common hallway or vestibule of an apartment house. There is no evidence here that this door was ever locked.... From the evidence *a conclusion could easily be reached that it was the custom of everyone entering this apartment house to use this vestibule as a public entrance and that this unlocked entrance door was open to the public.*

200 Md. at 600, 92 A.2d 739 (emphasis supplied). See also *Scott v. State,* 366 Md. 121, 130, 782 A.2d 862 (2001).

The federal caselaw, expressly dealing with the Fourth Amendment non-coverage of common areas in hotels, motels, and apartment houses, is in full accord. In *United States v. Colyer,* 878 F.2d 469 (D.C.Cir.1989), the dog sniff was conducted in the corridor of a railroad sleeping car. In rejecting the argument that the Fourth Amendment covered a public corridor, even in a sleeping car, the Court commented:

> Appellant argues that *Place* is inapposite in the context of a sniff of a sleeper car rather than of luggage located in a public place. To begin with, the public-private contrast that appellant urges is unconvincing, as appellant admits that *the*

*sniff of the compartment was conducted from a public corridor.*

878 F.2d at 474 (emphasis supplied).

In *United States v. Roby,* 122 F.3d 1120 (8th Cir.1997), the same argument as to Fourth Amendment coverage was made with respect to the corridor outside a hotel room. The Eighth Circuit rejected that argument.

Mr. Roby had an expectation of privacy in his Hampton Inn hotel room. But *because the corridor outside that room is traversed by many people, his reasonable privacy expectation does not extend so far. Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip. As a result, we hold that a trained dog's detection of odor in a common corridor does not contravene the Fourth Amendment.* The information developed from such a sniff may properly be used to support a search warrant affidavit.

122 F.3d at 1125 (emphasis supplied). See also *Wilson v. State,* 98 S.W.3d 265, 273 (Tex.App.2002) ("[A] dog sniff of the area exterior to the door of a hotel room is not a search under the Fourth Amendment.").

■ A hotel or motel room, a sleeping compartment in a railway car, and a residential apartment in a larger apartment house all enjoy the full measure of Fourth Amendment protection enjoyed by any home. *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel rooms protected under the Fourth Amendment to the same extent as homes); *United States v. Richard,* 994 F.2d 244, 247 (5th Cir.1993); *United States v. Jackson,* 588 F.2d 1046, 1052 (5th Cir.1979). Such places, however, do not typically throw out penumbral curtilages or surrounding Fourth Amendment buffer zones as do many, albeit not all, houses. Cf. *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Apartment A in this case did not.

■ In terms of the place covered by the Fourth Amendment, the outer boundary of the protected area was the property line of the apartment itself. Beyond that line, the vestibule of the apartment house was no different than a

public street or an open field. The police needed no justification for being there. The Fourth Amendment being inapplicable in that place, the police could have been on the most baseless or random of fishing expeditions and it would be beyond our area of concern.

### 4. Is a Dog Sniff a Fourth Amendment "Search," Generally?

Although Alex's vantage point itself was constitutionally unprotected ground, the question remains of whether his smelling of odors emanating from Apartment A constituted a "search." In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a canine sniff of the contents of closed luggage was not a Fourth Amendment "search." Justice O'Connor, 462 U.S. at 706, 103 S.Ct. 2637, posed the question.

The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog. Obviously, if this investigative procedure is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test—no matter how brief—could not be justified on less than probable cause.

The Supreme Court's holding was clear that the canine sniff was not a "search."

[W]e conclude that the particular course of investigation that the agents intended to pursue here—*exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.*

462 U.S. at 707, 103 S.Ct. 2637 (emphasis supplied).

Although a fuller explanation of its rationale would only follow a year later, *United States v. Place*, 462 U.S. at 707, 103 S.Ct. 2637, made it clear that central to its reasoning was the narrow focus of the canine sniff.

*[T]he sniff discloses only the presence or absence of narcotics, a contraband item.* Thus, despite the fact that the sniff

tells the authorities something about the contents of the luggage, the information obtained is limited. . . .

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.

(Emphasis supplied).

Although *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), was not itself a dog sniff case, it supplied the fuller rationale for why a narrowly focused investigative technique, one that reveals only the presence or absence of contraband, is not a Fourth Amendment "search." Justice Stevens's opinion pointed out initially that the Fourth Amendment is not a plenary prohibition against all unreasonable police activity but is only a more limited protection against "unreasonable searches and seizures."

The first Clause of the Fourth Amendment provides that *the "right of the people to be secure* in their persons, houses, papers, and effects, *against unreasonable searches and seizures,* shall not be violated. . . ." *This text protects two types of· expectations, one involving "searches," the other "seizures."*

466 U.S. at 113, 104 S.Ct. 1652 (emphasis supplied).

In an illuminating inversion of the word order of *Katz* 's "reasonable expectation of privacy," *Jacobsen* then provided what has come to be the standard definition of a Fourth Amendment "seizure."

A "search" occurs when *an expectation of privacy that society is prepared to consider reasonable* is infringed.

466 U.S. at 113, 104 S.Ct. 1652 (emphasis supplied).

Government agents had seized some white powder belonging to the defendants. They subjected a sample of that powder to a "field test" for cocaine. The issue before the Supreme Court was whether that chemical and/or microscopic examination of the defendants' property constituted a "search."

The question remains *whether* the additional intrusion occasioned by *the field test . . . was an unlawful "search" or "seizure" within the meaning of the Fourth Amendment.* 466 U.S. at 122, 104 S.Ct. 1652 (emphasis supplied).

The field test revealed to the investigators information which they otherwise would not have known. It self-evidently infringed some subjective expectation of privacy on the part of the defendants. The critical question, however, was whether the expectation of privacy that was infringed was one that society, objectively, has deemed to be reasonable.

> *The field test* at issue *could disclose only one fact* previously unknown to the agent—*whether or not a suspicious white powder was cocaine. It could tell him nothing more,* not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment—did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> The concept of *an interest in privacy that society is prepared to recognize as reasonable is,* by its very nature, *critically different from the mere expectation,* however well justified, *that certain facts will not come to the attention of the authorities.*

466 U.S. at 122, 104 S.Ct. 1652 (emphasis supplied).

In *Katz*'s characterization of a protected "expectation of privacy," it used the adjectives "reasonable" and "legitimate" interchangeably. For reasons of obvious emphasis, *United States v. Jacobsen,* at this point in its analysis, switched to the use of "legitimate."

> A chemical test that merely discloses whether or not a particular substance is cocaine *does not compromise any legitimate interest in privacy.* . . . It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, *no legitimate interest has been compromised.* . . . *Congress has decided*—and there is no question about its power to do so—*to treat the interest in "privately" possessing cocaine as*

*illegitimate;* thus *governmental conduct that can reveal whether a substance is cocaine,* and no other arguably "private" fact, *compromises no legitimate privacy interest.* 466 U.S. at 123, 104 S.Ct. 1652 (emphasis supplied).

The Supreme Court indicated that its holding in *Jacobsen* was "dictated" by its holding a year earlier in *United States v. Place,* as it referred to *Place*'s holding that "a 'sniff test' by a trained narcotics detection dog was not a 'search' within the meaning of the Fourth Amendment." 466 U.S. at 123, 104 S.Ct. 1652.

The Supreme Court could not, of course, rule out with mathematical certainty the abstract possibility that a test such as that employed in the *Jacobsen* case or in *United States v. Place* might not reveal a non-criminal fact. The marijuana in the *Place* case, for instance, might conceivably have been medically prescribed in a state such as California. The critical holding of the Court, however, was not to be foreclosed by a mere "remote" possibility.

Here, as in *Place, the likelihood that official conduct* of the kind disclosed by the record *will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.*

466 U.S. at 124, 104 S.Ct. 1652 (emphasis supplied).

In *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), Judge Cathell for the Court of Appeals analyzed at length both *United States v. Place* and *United States v. Jacobsen.*

Additionally, in *United States v. Jacobsen* the Supreme Court considered whether a chemical test used to determine if a substance was a controlled dangerous substance was a search. The Supreme Court expanded on its holding in *Place* and held that a police investigatory tool, such as a dog sniff or a chemical test, is not a search if it merely reveals the presence or absence of contraband because *the privacy interest in possessing contraband is not one that society recognizes as reasonable.*

364 Md. at 581, 774 A.2d 420 (emphasis supplied). The Court of Appeals then held squarely that a dog sniff is "neither a

search nor a seizure" and the Fourth Amendment, therefore, does not apply.

> *Because a K–9 scan,* under the circumstances such as those present here; *is neither a search nor a seizure, Fourth Amendment issues,* in respect to such a K–9 scan, *do not arise.* Thus, Trooper Prince did not need reasonable articulable suspicion of drug-related criminal activity prior to subjecting petitioner's Escort to the K–9 scan.

*Id.* (emphasis supplied). See *Gadson v. State,* 341 Md. at 8 n. 4, 668 A.2d 22.

This Court had earlier reached the same conclusion in *Gadson v. State,* 102 Md.App. at 557, 650 A.2d 1354.

> *Whether the Fourth amendment was even involved,* so as to require satisfaction, at that particular stage of the total investigative episode *depends upon whether a sniff or smell by a drug detection dog constitutes a "search" within the contemplation of the Fourth Amendment. It does not.*

(Emphasis supplied). In *Gadson* we even offered an alternative rationale, depending, to be sure, more on the locus of the sniffing than on its narrow focus.

> The elementary physics of the olfactory sense, at least in circumstances such as these, is that *the dog's nose never intrudes into a constitutionally protected area,* such as the appellant's truck. It is rather the case that *the dog's nose remains outside, where the dog's nose has a constitutionally unassailable right to be, and that the suspicious and incriminating vapors come wafting out across the public air to meet the dog's nose on the dog's nose's turf.* We see no doctrinal difference, be the investigator man or beast, between standing outside and smelling aromas emanating from a truck, on the one hand, and standing outside and hearing sounds resonating from a truck, on the other. In each case, *the sensory receptor remains outside where it has a right to be and the stimuli come out to meet it there.*

102 Md.App. at 557–58, 650 A.2d 1354 (emphasis supplied).

*United States v. Burns,* 624 F.2d 95, 100 (10th Cir.1980), took a similar position as to the unchallengeability of the vantage point at which the olfactory sensation is received.

Nor is it a search when a law enforcement officer makes visual observations from a vantage point he rightfully occupies. *This applies also to perceptions derived from hearing or smelling.*

(Emphasis supplied). *United States v. Roby,* 122 F.3d 1120, 1124–25 (8th Cir.1997), was equally firm about the unassailability of the dog's location and about the spot where the act of sensing occurs.

Here, Nero walked the Hampton Inn's fourth floor hallway. During this walk, he alerted at Room 426, the room occupied by Mr. Roby. *Roby contends the dog's detection of the odor molecules emanating from his room is the equivalent of a warrantless intrusion. We find that it is not.* The fact that the dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal. *Just as evidence in the plain view of officers may be searched without a warrant, evidence in the plain smell may be detected without a warrant.*

(Emphasis supplied).

*United States v. Reed,* 141 F.3d 644, 649 (6th Cir.1998), also held squarely that the critical spot for the constitutional assessment is not the place whence the odors emanate but the place where the act of smelling occurs.

Just as the sniffing of contraband by trained canines does not constitute an unlawful search, neither does the viewing by humans of contraband in plain sight amount to an unlawful search. *As long as the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred.* In addition, just as contraband in plain view may be seized if legally accessed and may also provide probable cause to obtain a search warrant, so, too, "[a] positive reaction by a properly trained narcotics

dog can establish probable cause for the presence of controlled substances."

(Emphasis supplied).

In *State v. Funkhouser*, 140 Md.App. 696, 711, 782 A.2d 387 (2001), we reaffirmed our earlier holding in *Gadson*.

*The smelling or sniffing* of the exterior surface of an otherwise protected repository (automobile, suitcase, locker, etc.) *is not a "search"* within the contemplation of the Fourth Amendment. *It, therefore, needed no justification.*

(Emphasis supplied). See also *Carter v. State*, 143 Md.App. 670, 695–96, 795 A.2d 790 (2002); *Wallace v. State*, 142 Md. App. 673, 683, 791 A.2d 968, *aff'd*, 372 Md. 137, 812 A.2d 291 (2002); *In Re Montrail M.*, 87 Md.App. 420, 435–36, 589 A.2d 1318 (1991), *aff'd*, 325 Md. 527, 601 A.2d 1102 (1992).

### 5. Does the Presence of a Home Transform a "Non–Search" Into a "Search"?

Essentially agreeing that the smelling, by man or dog, of odors emanating from such protected, albeit lesser protected, repositories of property as automobiles, suitcases, and school lockers does not constitute a Fourth Amendment "search," the appellant maintains strenuously that when the odors emanate from the interior of a home, the Fourth Amendment interests are of a higher order. He argues that adding to the equation the enhanced protection of the home is enough to elevate the dog sniffing into a "search," thereby engaging the gears of Fourth Amendment protection.

To be sure, the protection of the home from "unreasonable searches and seizures" is the "core value" of the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). When the Fourth Amendment is involved, therefore, a higher level of justification is required for the police to intrude into the protected area. Generally speaking, nothing less than a judicially issued warrant will suffice to search a house for evi-

dence, whereas probable cause alone will justify the warrantless search of an automobile, suitcase, or locker.

■ The higher level of justification required to satisfy the Fourth Amendment when it applies, however, is not to be confused with the very different issue of whether the amendment applies. Even the enhanced protection of the home is still limited to being a protection against "unreasonable searches and seizures." It is not a protection against non-searches and non-seizures, reasonable or unreasonable.

As the appellant points out, *United States v. Place* dealt only with a dog sniff of a suitcase in an airport, and the Maryland cases following *Place* have similarly not dealt with the dog sniffing of a residence. The rationale of *Place* and of *Jacobsen*, however, had absolutely nothing to do with the locus either 1) of where the dog sniffing took place or 2) of where the subjective expectation of privacy was being entertained.

■ The *raison d'etre* for treating a dog sniff as a non-search is that the binary nature of its inquiry, "contraband 'yea' or 'nay'?," precludes the possibility of infringing any expectation of privacy that society objectively considers to be legitimate. If the possession of narcotics in an automobile or a suitcase is illegitimate, so too is the possession of narcotics in a home. It is the criminal nature of the possession itself that takes the activity out from under the protection of the Fourth Amendment, not the place where the possession occurs.

The appellant does enjoy the benefit of being able to cite one federal case in support of his contention. *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985). A trained dog sniffed at the door of the defendant's apartment and alerted to the presence of narcotics. That information was subsequently included in an application for a search warrant for the apartment. Drugs were recovered. In reversing the trial judge's decision not to suppress the fruits of that search, the Second Circuit held that the dog sniff of odors emanating from a residential apartment was a "search" within the contemplation of the Fourth Amendment.

We have recognized the heightened privacy interest that an individual has in his dwelling place.... We stated that "the very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to respect his privacy....

Thus, a practice that is not intrusive in a public airport may be intrusive when employed at a person's home.... With a trained dog, police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses.... Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation.... *Because of defendant Wheelings' heightened expectation of privacy inside his dwelling the canine sniff at his door constituted a search.* As the agent had no warrant, the search violated the Fourth Amendment. Hence, we conclude that the information gathered from the dog's alert may not properly be used to support the issuance of the search warrant of Wheelings' apartment.

757 F.2d at 1366–67 (emphasis supplied).[2]

The *Thomas* opinion, however, has met with the universal disapprobation of all the federal circuit and district courts that have considered it. In *United States v. Colyer*, 878 F.2d 469 (D.C.Cir.1989), the Circuit Court of Appeals for the District of Columbia challenged *Thomas*'s reasoning.

---

**2.** Ironically, *United States v. Thomas*, on which the appellant relies, goes on to affirm the conviction and to affirm the hearing judge's decision not to suppress the evidence by holding that the officers who executed the warrant were entitled to rely on it pursuant to *Sheppard* and *Leon*. 757 F.2d at 1367–68. As we explained in Part II A 1 c, *supra*, the *Sheppard–Leon* "good faith" exemption from the exclusionary rule should not apply to a constitutionally tainted warrant application under the "fruit of the poisoned tree" doctrine. The *Thomas* opinion, in our judgment, appears to have been just as flawed in what it erroneously denied the defendant as in what it erroneously gave him.

> As an initial matter, *the very correctness of the Thomas decision is called into question by its assertion that the defendant "had a legitimate expectation* that the contents of his closed apartment would remain private." As was shown above, the Supreme Court's analyses in *Place* and *Jacobsen* indicate that *a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed.* No legitimate expectation of privacy is impinged by governmental conduct that can "reveal nothing about noncontraband items."

878 F.2d at 475 (emphasis supplied).

In *Colyer,* the Court of Appeals upheld the proposition that the canine "sniff of the exterior of an Amtrak roomette" was not a Fourth Amendment search. 878 F.2d at 473. The opinion stressed the limited and binary nature of the canine inquiry.

> As in *Place,* the driving force behind *Jacobsen* was the recognition that *because of the binary nature of the information disclosed by the sniff, no legitimately private information is revealed:* That is, "the governmental conduct could reveal nothing about noncontraband items.
>
> In our view, then, *Place* and *Jacobsen* stand for the proposition that *a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed.* Stated otherwise, governmental conduct that can "reveal nothing about noncontraband items" interferes with no legitimate privacy expectation.

878 F.2d at 474 (emphasis supplied).

In *United States v, Lingenfelter,* 997 F.2d 632, 638 (1993), the Ninth Circuit joined the District of Columbia Circuit in rejecting the reasoning of *Thomas.* In *United States v. Reed,* 141 F.3d 644, 649–50 (1998), the Sixth Circuit also joined the anti-*Thomas* chorus.

> Essential to Reed's argument is his contention that *Place,* which held that a sniff is not a search, applies only to "public sniffs." Reed relies on *United States v. Thomas* to support his argument.

*Thomas seems to stand alone in its pronouncement that a canine sniff may constitute an unreasonable search.* According to the *Thomas* court, the heightened privacy interest in a dwelling place renders a canine sniff intrusive on the inhabitant's expectation of privacy, even with respect to contraband. Yet, *this holding ignores the Supreme Court's determination in Place that a person has no legitimate privacy interest in the possession of contraband, thus rendering the location of the contraband irrelevant to the Court's holding that a canine sniff does not constitute a search.*

(Emphasis supplied).

After noting the other two circuits that had earlier rejected the *Thomas* approach, the Sixth Circuit made its own holding clear.

*At least two circuits have rejected the Thomas court's holding because it conflicts with the Supreme Court's determination that "no legitimate expectation of privacy is impinged by governmental conduct that can reveal nothing about noncontraband items."* ... We now take the opportunity to clarify that a canine sniff is not a search within the meaning of the Fourth Amendment. Of course, the canine team must lawfully be present at the location where the sniff occurs.

141 F.3d at 650 (emphasis supplied).

In *United States v. Sklar,* 721 F.Supp. 7 (1989), the United States District Court for Massachusetts was faced with an enhanced expectation of privacy argument based on *United States v. Thomas.*

The *Thomas* court suggested, that there are instances in which a person's legitimate expectation of privacy is so great that even the relative minor intrusion of a canine sniff will run afoul of the Fourth Amendment.

721 F.Supp. at 13. After pointing out "that not all intrusions are unreasonable, and not all expectations of privacy are legitimate," the District Court rejected the *Thomas* rationale.

Even if the Court were to agree (which it does not) that Sklar has a heightened, "dwelling-like" expectation of privacy with respect to his Express Mail packages, *that expectation of privacy is not justified when it is asserted with respect to contraband.*

721 F.Supp. at 14 (emphasis supplied).

The most remarkable criticism of the *Thomas* decision came in *United States v. Hogan,* 122 F.Supp.2d 358 (E.D.N.Y.2000), a United States District Court within the Second Circuit that had promulgated *Thomas.* Reluctantly acknowledging that it would have no choice but to follow *Thomas* if it were applicable, the District Court went out of its way to distinguish *Thomas.* It did not hesitate, however, to offer its opinion that *Thomas* had been wrongly decided.

*Thomas appears never to have been followed by any court outside the Circuit and has been criticized by several other circuit courts.* Those courts have pointed out that the rationale underlying the *Thomas* decision conflicts with the underpinnings of the Supreme Court's holding that the canine sniff in *Place* did not constitute a search.... *Thomas thus appears to be at odds with Place and Jacobsen.*

Although *Thomas* remains the law in this circuit the foregoing discussion suggests that it should not be applied expansively.

122 F.Supp.2d at 369 (emphasis supplied).

The second leg of the tripod on which the appellant's argument rests is *People v. Dunn,* 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054 (1990). That decision by the Court of Appeals of New York, however, completely undercuts the appellant's argument. The facts are remarkably similar to those before us in this case. Having received a report that drugs were being kept in an apartment, "the police arranged to have a trained narcotics detection dog brought to the common hallway outside his apartment door." 563 N.Y.S.2d 388, 564 N.E.2d at 1055. "The dog 'alerted,' indicating the presence of drugs inside the apartment." *Id.* Based on that information, the police obtained a search warrant. The search

revealed drugs and the defendant was convicted. The defendant appealed the denial of his pretrial motion to suppress the evidence.

The New York Court of Appeals analyzed the suppression ruling under two separate and distinct doctrinal microscopes, one, the federal Fourth Amendment; and the other, the New York Constitution. It is only the Fourth Amendment analysis that concerns us in this case. In concluding that the canine sniff was not a "search" under the Fourth Amendment, the Court of Appeals began its analysis with an examination of the rationale of *United States v. Place.* It reasoned that the binary character of the investigative technique obviated any risk of infringing an expectation of privacy that society deemed legitimate.

> *In holding this investigative method not to be a search, the court primarily focused on* its discriminate and nonintrusive character, particularly *the extremely limited nature of the information revealed by such a procedure.* "A 'canine sniff' by a well-trained narcotics detection dog does not expose noncontraband items* that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of [a person's] luggage.... [T]he sniff discloses only the presence or absence of narcotics,* a contraband item ...." (*see also, United States v. Jacobsen* ["governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest", and thus, does not constitute a search within the meaning of the Fourth Amendment].)

563 N.Y.S.2d 388, 564 N.E.2d at 1056 (emphasis supplied).

In reaching its conclusion on the Fourth Amendment question, the New York court also rejected the opinion of the Second Circuit in *United States v. Thomas* in terms of Fourth Amendment analysis.

In light of the rationale adopted by the Supreme Court in *Place,* and reaffirmed in *Jacobsen,* we reject defendant's contention that his federal constitutional rights were violat-

ed.... *Although the Second Circuit, in United States v. Thomas, held Place inapplicable to "residential sniffs," we find its attempt to distinguish that case unpersuasive. The distinction* it relies upon, namely, the heightened expectation of privacy that a person has in his residence, *is irrelevant under Place's rationale.* Whether or not there exists a heightened expectation of privacy, the fact remains that a "canine sniff" reveals only evidence of criminality. *Since that was the factor that was determinative in Place, we conclude that its holding is controlling even where the target of the "canine sniff" is a residence.*

563 N.Y.S.2d 388, 564 N.E.2d at 1056–57 (emphasis supplied).

Judge Gelfman's analysis in her Memorandum Opinion and Order is in complete accord with our own.

It appears to this court that Defendants relied erroneously on *People v. Dunn.* The *Dunn* Court does two separate analyses of a canine sniff, one under the Federal Constitution and one under the New York State Constitution. Relying on the Supreme Court's rationale in *United States v. Place* and *United States v. Jacobsen,* the *Dunn* court specifically held that Dunn's rights were *not* violated under the Federal Constitution because the canine sniff done outside his apartment could only reveal the presence or absence of illegal drugs. It states that the 2nd Circuit's analysis in *Thomas* was "unpersuasive" because an argument based on a heightened expectation of privacy is irrelevant when the canine sniff only reveals "evidence of criminality."

In a totally separate analysis, *People v. Dunn* did, to be sure, then go on to hold that the dog sniffing of odors coming from a residential apartment was a "search" within the contemplation of the New York Constitution. 563 N.Y.S.2d 388, 564 N.E.2d at 1057–58. That holding, on independent state grounds, is of no persuasive value to us [3] unless we are

---

**3.** This also disparages as unpersuasive the appellant's reliance on *State v. Dearman,* 92 Wash.App. 630, 962 P.2d 850 (1998). That decision relied exclusively on the Washington State Constitution and did not even mention the Fourth Amendment.

prepared to abandon Maryland's traditional practice of deeming Article 26 of the Maryland Declaration of Rights to be *in pari materia* with the federal Fourth Amendment. We are not.

In *Gahan v. State*, 290 Md. 310, 319–21, 430 A.2d 49 (1981), Judge Smith traced at length the parallel histories and interpretations of Article 26 and the Fourth Amendment. His conclusion was sure, "This Court has said many times that Art. 26 is *in pari materia* with the Fourth Amendment." 290 Md. at 319, 430 A.2d 49. See also *Gadson v. State*, 341 Md. 1, 8 n. 3, 668 A.2d 22 (1995); *Little v. State*, 300 Md. 485, 493 n. 3, 479 A.2d 903 (1984); *Liichow v. State*, 288 Md. 502, 509 n. 1, 419 A.2d 1041 (1980); *Merrick v. State*, 283 Md. 1, 4 n. 2, 389 A.2d 328 (1978); *Givner v. State*, 210 Md. 484, 492, 124 A.2d 764 (1956); *Blum v. State*, 94 Md. 375, 382, 51 A. 26 (1902). In *Scott v. State*, 366 Md. 121, 139, 782 A.2d 862 (2001), Judge Wilner held for the Court of Appeals:

> Nor are we prepared to make such a holding based on Article 26 of the Maryland Declaration of Rights. Notwithstanding its lack of textual consistency with the Fourth Amendment, *we have consistently construed Article 26 as being in pari materia with the Federal provision and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment.*

(Emphasis supplied). And see *Henderson v. State*, 89 Md. App. 19, 24, 597 A.2d 486 (1991) ("Article 26 of the Maryland Declaration of Rights does not afford appellant any greater protection than that of the Fourth Amendment to the United States Constitution.").

Judge Gelfman's ruling recognized this parity between the Maryland and the United States Constitutions.

> While the New York Constitution may [give greater protection], the Maryland Court of Appeals has consistently construed Article 26 as being *in pari materia* with the Federal provision and has accepted as persuasive the Supreme Court's construction of the Fourth Amendment. Therefore, this Court finds also that there is no expectation of privacy

in contraband, and a canine sniff outside the door of a residence when law enforcement is there lawfully is not a "search".

The third leg of the appellant's tripod is authoritatively rickety. He relies on *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999). We are not only not persuaded by *State v. Ortiz*; we are almost counter-persuaded by it. It is a badly, if not disingenuously, reasoned opinion. Despite the fact that the concurring opinion in the case expressly brought the issue to the attention of the court, "The majority in the instant case never addresses whether they consider the canine sniff conducted at the threshold of Ortiz's apartment to be a search." 600 N.W.2d at 827 (concurring opinion by Connolly, J.). The reason for that avoidance seems clear. The court could not cogently have reached the result it wanted to reach and did reach, if it had squarely addressed the key rationale of *Place* and *Jacobsen.*

 We hold that a sniff by a trained dog, standing where it has a right to be, of odors emanating from any protected place, residence or otherwise, is not a "search" within the contemplation of the Fourth Amendment.[4]

---

4. It is by no means clear to what end the appellant seeks to have us make a ruling in his favor on independent state grounds. Even were we to find that Alex's sniff was a "search" within the contemplation of Article 26 of the Maryland Declaration of Rights but not within that of the Fourth Amendment, the appellant's argument would hit a brick wall.

Maryland has no independent exclusionary rule for physical evidence. Maryland has always been among the overwhelming majority of American states that have, on balance, opted against an exclusionary rule for search and seizure violations. The only extant exclusionary rule that the appellant can call upon is that imposed upon Maryland in 1961 by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Mapp*'s exclusionary rule, of course, is available only for violations of the federal Fourth Amendment.

We explored this subject fully in *Howell v. State*, 60 Md.App. 463, 468 n. 2, 483 A.2d 780 (1984).

Maryland, of course, has no exclusionary rule. Following the lead of Judge Cardozo in *People v. Defore*, 242 N.Y. 13, 150 N.E. 585 (1926), Maryland is one of the approximately thirty jurisdictions that affirmatively rejected the exclusionary rule. *Lawrence v. State*, 103 Md. 17,

### 6. The Use of a Dog's Nose Is Not A New or Startling Investigative Modality

■ In one final push to escalate Alex's sniff into a Fourth Amendment "search," the appellant invokes *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) and *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and the allegedly special status of "sense-enhancing technology" where "the technology in question is not in general public use." 533 U.S. at 34–35, 121 S.Ct. 2038.

With reference to a thermal imaging device used to scan the roof of a building, *Kyllo* had observed:

> *[W]here*, as here, *the Government uses a device that is not in general public use*, to explore details of the home that would previously have been unknowable without physical intrusion, *the surveillance is a "search" and is presumptively unreasonable without a warrant*.

533 U.S. at 40, 121 S.Ct. 2038 (emphasis supplied).

Standing upon that predicate, the appellant, in his brief, stretched out to contend:

> The rationale applied in *Kyllo* and *Karo* is also applicable here. *Drug detecting dogs are not in general public use.* The information obtained through the dog sniff—the presence of drugs in the apartment—could not otherwise have been obtained without physical intrusion into the apartment. The detection of drugs in Fitzgerald's apartment, like the detection of the can of ether in *Karo* and the detection of how warm Kyllo was heating his home, was an intimate detail because it was a "detai[l] of the home." *Kyllo, supra*

63 A. 96 (1906); *Meisinger v. State*, 155 Md. 195, 141 A. 536 (1928); *Lambert v. State*, 196 Md. 57, 75 A.2d 327 (1950); *In Re Special Investigation No. 228, supra*, 54 Md.App. at 160, 458 A.2d 820. The Maryland Legislature enacted a limited exclusionary rule, known as the Bouse Act, by Chapter 194 of the Acts of 1929. It specifically exempted all felonies and even certain of the more serious misdemeanors. In 1973, moreover, Maryland repealed even the limited statutory exclusion called for by the Bouse Act.
See also Judge Krauser's recent reaffirmation of Maryland's historic position in *Miller v. State*, 151 Md.App. 235, 246, 824 A.2d 1017 (2003).

at 38, 121 S.Ct. 2038. In short, *a drug sniffing dog is the functional equivalent of the sense-enhancing devices used in Kyllo and Karo. Accordingly, the dog sniff in this case was a search* within the meaning of the Fourth Amendment and Article 26.

(Emphasis supplied).

*Karo* and *Kyllo,* however, are not apposite to the issue of whether a dog sniff is a Fourth Amendment "search." The limited and binary nature of the investigative technique, the critical predicate on which the holdings of *Place* and *Jacobsen* stood, was not a factor in either *Karo* or *Kyllo.* What was detected inside a home in *Karo* was the presence of ether, a non-contraband item with many legitimate, as well as illegitimate, uses. After holding that a dog sniff of a sleeper compartment on an Amtrak train was not a Fourth Amendment search, *United States v. Colyer,* 878 F.2d at 474 n. 5, explained why *Karo* did not undercut that holding.

*United States v. Karo* does not detract from this analysis. In *Karo,* the Supreme Court held that *the "beeper surveillance" of a container of ether* (which could be used to extract cocaine from clothing) within a home constituted a search within the ambit of the Fourth Amendment. *Ether is not contraband and its mere possession is entirely lawful. ... Thus, Karo is factually distinct from both Place and Jacobsen, where the procedure disclosed only the presence or absence of a contraband item.*

(Emphasis supplied).

In *Kyllo,* the thing detected was that unusual amounts of heat were being generated inside the home, a phenomenon that is not itself criminal and could well have had a non-criminal explanation. The homeowner in *Kyllo* might well have been growing hothouse orchids or, as the Supreme Court pointed out, 533 U.S. at 38, 121 S.Ct. 2038, the "Agema Thermovision 210 might disclose at what hour each night the lady of the house takes her daily sauna." After holding that a dog sniff of a hotel room was not a Fourth Amendment search, *Wilson v. State,* 98 S.W.3d at 272, explained why *Kyllo* did not undercut that holding.

[A]ppellant contends the dog sniff at the door of the hotel room was an illegal search under *Kyllo v. United States.* In *Kyllo,* the police, while standing on a public street, used a thermal imaging device to determine if *the amount of heat emanating from Kyllo's home* was consistent with the type of high-intensity lamps typically used for growing marijuana indoors.

. . . .

In *Kyllo, the surveillance device used was a sophisticated piece of technology that revealed information, other than the presence of contraband, about the interior of Kyllo's home.*

Here, the dog's sniff did not explore the details of the hotel room; *the sniff revealed nothing about the room other than the presence of cocaine.*

(Emphasis supplied).

The investigative techniques employed in *Karo* and *Kyllo* were not limited to discovering the presence or absence of contraband drugs. They detected only circumstantial evidence of crime, not the very gravamen of crime itself. Those decisions, therefore, do not come within the rationale of *Place* and *Jacobsen.* Significantly, neither *Karo* nor *Kyllo* even mentions *Place* or *Jacobsen.* In terms of Fourth Amendment applicability, *Karo* and *Kyllo* are cases involving the coverage of the place searched rather than cases involving the coverage of the police activity, to wit, whether the activity infringed an expectation of privacy that society deems legitimate. The issue of place is distinct from the issue of objectively legitimate expectations and the different varieties of coverage do not mix.

Another critical distinction between this case and *Kyllo* is that *Kyllo* displayed an almost obsessive concern with "the advance of technology," the "power of technology to shrink the realm of guaranteed privacy," and particularly "technology [that] is not in general use." 533 U.S. at 34, 121 S.Ct. 2038. *Kyllo*'s fear was that the failure to prohibit thermal imaging "would leave the homeowner at the mercy of advancing tech-

nology—including imaging technology that could discern all human activity in the home." 533 U.S. at 35–36, 121 S.Ct. 2038. The concern was not so much with present investigative capability but with "more sophisticated systems that are already in use or in development," as *Kyllo* predicted that the "ability to 'see' through walls and other opaque barriers is a clear, and scientifically feasible, goal of law enforcement research and development." 533 U.S. at 36, n. 3, 121 S.Ct. 2038.

*Kyllo*'s concern was also with the unfamiliarity of technology "that is not in general public use."

> "[W]here the Government uses *a device that is not in general public use,* to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search.' "

533 U.S. at 40, 121 S.Ct. 2038 (emphasis supplied). In situations in which, by contrast, once new technology has become familiar and is acknowledged to be "in general public use," the special Fourth Amendment protection is no longer present.

> [T]he technology enabling human flight has exposed to public view (and hence, we have said, to official observation) uncovered portions of the house and its curtilage that once were private.

533 U.S. at 34, 121 S.Ct. 2038.

The investigative use of the animal sense of smell, human or canine, cannot even be defined as a technology. It is, *a fortiori,* not an unfamiliar or rapidly advancing technology that "is not in general use." Bloodhounds have been chasing escaping prisoners and other fugitives through the swamps for hundreds of years, with posses following dutifully and trusting implicitly in the canine expertise, even at the closed doors of cabins and houses. The canine reactions, moreover, have traditionally been admissible as evidence even at a trial on the merits, let alone in an *ex parte* application for a warrant.

The use of the sense of smell generally is a familiar tool of perception much older than the common law or the Bill of Rights. Indeed, *Blair v. Commonwealth,* 181 Ky. 218, 204 S.W. 67, 68 (Ky.1918), stated that bloodhound evidence "was looked upon with favor as early as the twelfth century," as it

related a declaration of King Richard I of England (1189–1199), "Dress yonder Marquis [who had stolen the banner of England] in what peacock robes you will, disguise his appearance, alter his complexion with drugs and washes, hide him amidst a hundred men; I will yet pawn my scepter that the hound detects him." It is hardly a new or unfamiliar investigative modality.

The use of a dog's sense of smell is not an arcane science known only to the police; it is something deeply ingrained in our general culture. We know that a canine "non-alert" may be as probative as an "alert," as, in *Silver Blaze*, Sherlock Holmes explained the significance of "the dog that did not bark in the night." In *The Odyssey*, Homer recounts how Ulysses's incognito return to Ithaca, after an absence of twenty years, was almost compromised when his faithful dog, Argos, alerted to the smell of his long missing master. The point is that, solidly based in both fact and fiction, the canine sense of smell is not a new or unfamiliar "technology."

The Supreme Court recognized the logical probity of the sense of smell as early as *Taylor v. United States*, 286 U.S. 1, 5–6, 52 S.Ct. 466, 76 L.Ed. 951 (1932) ("As the agents approached the garage they got the odor of whisky coming from within"; "Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime.").

Of the basic animal senses, the sense of sight, of course, is far and away the most productive of incriminating data. The sense of hearing is a solid second. At that point, of course, there is a big drop-off in productivity, but the sense of smell still ends up in third place, well ahead of the occasional use of the sense of touch. See *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) and the recently recognized "plain feel" doctrine.[5]

Historically, the law has drawn no doctrinal distinction between the human and the canine sense of smell. In *John-*

---

5. We are unaware of any case where probable cause or reasonable suspicion has been established by the sense of taste, although such a possibility is not to be foreclosed.

*son v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), it was human agents who stood outside a hotel room and warrantlessly smelled the "odor of burning opium" emanating from inside the room. That evidence would have been constitutionally unassailable as the basis for the issuance of a search warrant.

At the time entry was demanded the officers were possessed of *evidence which a magistrate might have found to be probable cause for issuing a search warrant.* We cannot sustain defendant's contention, erroneously made, on the strength of *Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951, that odors cannot be evidence sufficient to constitute probable grounds for any search. That decision held only that odors alone do not authorize a search without warrant. *If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor,* and it is one sufficiently distinctive to identify a forbidden substance, *this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character.*

333 U.S. at 13, 68 S.Ct. 367 (emphasis supplied).

What is constitutionally vulnerable to the human nose is constitutionally vulnerable to the canine nose. As the Second Circuit characterized the constitutionally parallel situations in *United States v. Bronstein,* 521 F.2d 459, 461 (2d Cir.1975):

If the police officers here had detected the aroma of the drug through their olfactory senses, there could be no serious contention that their sniffing in the area of the bags would be tantamount to an unlawful search. *We fail to understand how the detection of the odoriferous drug by the use of the sensitive and schooled canine senses here employed alters the situation* and renders the police procedure constitutionally suspect.

(Emphasis supplied).

*United States v. Thomas,* 787 F.Supp. 663, 684 (E.D.Tex. 1992), *aff'd,* 983 F.2d 1062 (5th Cir.1993), stressed that if the

use of the human sense of smell is not a search, neither is the use of the canine sense of smell.

This Court recognized the indistinguishable nature of the kindred investigative modalities in *Gadson v. State*, 102 Md. App. at 558, 650 A.2d 1354.

If Trooper Prince, while standing outside, had himself detected a suspicious smell escaping from the truck, no one could dispute his entitlement to factor that sensory data into his accumulation of probable cause. *That the Maryland State Police chose to rely on Sandy's nose rather than on Trooper Prince's nose was a tactical decision without constitutional significance; it was nothing more than the most efficient deployment of the respective investigative talents of available personnel.*

(Emphasis supplied).

There is nothing in *Karo* or *Kyllo* that causes us to question our conclusion that Alex's sniff at the door of Apartment A was not a "search" within the contemplation of the Fourth Amendment.

### B. The Arguable Justification For The Purported "Search" of March 19 Is Moot

The appellant's fourth sub-contention is a contingent one. He claims that **IF** the police activity in 3131 Normandy Woods Drive on March 19 culminating in Alex's "alert" on Apartment A had, indeed, been a "search" within the contemplation of the Fourth Amendment, it would have been an unconstitutional search. He argues that such a "search" would have lacked any of the alternative Fourth Amendment justifications of being 1) pursuant to a warrant, 2) based on probable cause, or even 3) based on reasonable suspicion.

We would, if this contingent issue were before us, be inclined to think that if this activity of March 19 had, indeed, constituted a search of a residence, then, in the absence of exigent circumstances, nothing less than a warrant would have served as adequate justification. Neither probable cause nor reasonable suspicion can justify the warrantless search of a

residence for evidence of crime. A warrant is required for such a purpose.

The fact that the search might consist only of a canine sniff is beside the point. Canine sniffing at the door of a residence is either a Fourth Amendment search or it is not. There is no such half-way thing as a quasi-search of a residence requiring some lesser or intermediate level of justification. *Arizona v. Hicks,* 480 U.S. 321, 328–29, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (There is no in-between or quasi-Fourth Amendment coverage. The police action is either a "full-blown search," on the one hand, or it "is not a 'search' for Fourth Amendment purposes," on the other hand, and "therefore does not even require reasonable suspicion."); *United States v. Colyer,* 878 F.2d 469, 477–79 (D.C.Cir.1989). If the canine sniff is a search, the Fourth Amendment applies in full force and must be fully satisfied. If it is not a search, the Fourth Amendment is utterly inapplicable and requires no justification whatsoever. There is no half way.[6]

Our earlier holding (in Part II A), however, that Alex's "alert" on Apartment A was not a "search" within the contemplation of the Fourth Amendment makes moot any question of whether there would have been a Fourth Amendment justification for it, if it had been a search. In circumstances where there was no search at all, self-evidently there can have been no unconstitutional search. If the Fourth Amendment does not apply, it can be neither satisfied nor violated.

### III. An Appraisal of the Discounted Warrant Application Is Moot

The appellant's fifth and final sub-contention is that, if for either intrinsic or extrinsic reasons we factor out of the warrant application the result of Alex's having twice alerted to

---

**6.** A requirement for either a probable-cause-based warrant or even probable cause without a warrant as justification for a dog sniff would be an exercise in redundancy. The probable cause to conduct a dog sniff would *ipso facto* make the dog sniff unnecessary. The probable cause would in and of itself justify the issuance of the search warrant and the dog sniff would be superfluous.

the presence of drugs in Apartment A, the remaining allegations were not enough to have afforded a "substantial basis" for Judge Ellinghaus–Jones to have issued it.

Because of 1) the significantly watered-down "substantial basis" standard of review, 2) the possible inference that the "anonymous source" was a citizen-informer rather than a more suspect "snitch" from the criminal milieu, and 3) some independent police verification of some of the anonymous source's information, it is by no means certain that the appellant's claim is true.

Because we do not find it necessary to factor out Alex's canine "alert" to Apartment A, however, the contention is moot. The sub-contention is completely contingent upon the appellant's success with respect to one or more of his earlier sub-contentions. The posited contingent circumstances have not come to pass. We intimate nothing as to what the result might have been if they had.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**